## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------x
JOSHUA NEWTON,                        |
                                      |        Case No.: 1:22-cv-00540-AT
                    Plaintiff,        |
                                      |
       -against -                     |
                                      |
RONALD MEYER and NBC                  |
UNIVERSAL MEDIA LLC,                  |
                                      |
                    Defendants.       |
-----------------------------------------------------------x
```

### THIRD AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Joshua Newton ("Newton") by his attorneys Nesenoff & Miltenberg LLP, as and for his Complaint against Defendants Ronald Meyer ("Meyer") and NBC Universal Media LLC ("NBCUniversal") (collectively "Defendants"), respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1.     Newton is an award-winning filmmaker, whose reputation, career and film projects have been seriously harmed by the actions of Ronald Meyer ("Meyer"), former President and COO of Universal Pictures, during his employment as Vice Chairman of the parent corporation of Universal Pictures, NBCUniversal Media LLC, ("NBCUniversal"). Meyer, whose employment has since been terminated, was at the time one of the most powerful and influential people in Hollywood and was acting not only in the course of business of NBCUniversal, but also in concert with other employees at the company.

2.     Meyer's conduct throughout is illustrated in context of a lawfully recorded phone conversation that took place at Meyer's request between Meyer, Newton and Newton's business partner, Kevin Farr ("Farr") on or about September 4, 2017, where Meyer told Farr "I asked Joshua

to put me in touch with you because obviously you're his partner and his friend". During this conversation, in a bid to persuade Farr to accept significantly less favorable terms than had been agreed previously with since-"me-too"-disgraced Hollywood film producer Brett Ratner ("Ratner") in regard to Newton and Farr's feature film project "Nicole & O.J.", Meyer made a number of representations, including (referring to O.J. Simpson) "I always thought he was guilty until I read Josh's script"; "I've come to now know Josh really well and believe in him a hundred percent"; "I think Joshua has a vision that's quite brilliant"; "Let's go sell it"; "Let's make this movie before this guy gets out of prison"; "We'll find ways to get this movie financed and distributed"; "I want my company to see it"; "Forgive me if I sound more like Brett's agent I'm absolutely not, I'm much more on Joshua's side, I know Joshua knows that".

3.    Having told Newton a few months earlier that Ratner had offered to fully finance and become a producer on the project with an investment of $20 million, Meyer was now trying to persuade Newton and Farr to accept a substantially reduced $1million investment, without Ratner's attachment, to shoot a small portion of Newton's script and raise the rest of the funding with Meyer's assistance. "Get this presentation film made", Meyer told Newton and Farr, "Make the presentation and let's go sell it" and "There's no substitute for having a half hour of film or 15 minutes of a film and a script".

4.    When Farr pointed out to Meyer that he was not prepared to forgo Ratner's contractual undertaking to be a producer on the project, which Farr had already invested millions of dollars in, Meyer replied "I think you're being a hundred percent reasonable. And the only thing I want to say is that I believe everyone will get their money back once Josh was able to start filming this movie".

5.    Acting on Meyer's advice which secured Farr's approval, Newton entered into a

highly flawed agreement with Ratner, that included as will be discussed below, Australian billionaire James Packer, then CEO of Warner Bros Kevin Tsujihara and film mogul Avi Lerner. (the "Ratner Group").

6.      Newton, as advised by Meyer, went ahead and shot part of the film. Meyer, however, did not deliver on any of his promises.  Meyer did not raise the rest of the finance of the film.  Meyer did not sell the film. Meyer did not find ways of distributing the film. Farr did not get his money back once Newton began filming, as Meyer said he would.

7.      As a result of Meyer's advice, false promises, and tortious conduct, "Nicole & O.J." remains uncompleted and damaged. Meyer's actions have also damaged Newton's other projects and Newton's career.

8.      Meyer's conduct throughout is also stated in context of the nature of all communications between Meyer and Newton. At all times Newton's goal was to do business with NBCUniversal, and Meyer presented himself throughout as acting on behalf of his company as well as a talent agent for Newton. Meyer's initial meeting with Newton was at Meyer's invitation to discuss NBCUniversal producing Newton's script "The Will to Resist," a feature film about the triumph of women over tyranny, and was held at Meyer's office at Universal Studios.  The meeting was scheduled by Meyer's assistants, and Newton was issued an NBCUniversal pass at the studio gate before being greeted by someone from Meyer's office. All emails sent by Meyer to Newton throughout their relationship were from Meyer's NBCUniversal address, meyer.meyer@nbcuni.com.  All emails sent by Newton to Meyer were to Meyer's NBCUniversal address, meyer.meyer@nbcuni.com.  All emails between Meyer and Newton were screened by Meyer's assistants, NBCUniversal employees.  All telephone calls made by Meyer to Newton were patched through by NBCUniversal employees who worked as Meyer's assistants, made from either

Meyer's NBCUniversal office, or while travelling on NBCUniversal business. When Newton asked, Meyer would not give Newton his cell phone number and stated that the best way to reach him was through Meyer's NBCUniversal office or by email to Meyer's NBCUniversal email address, which Meyer stated one of his assistants "would pick it up." NBCUniversal's technical resources and screening facilities were used at Meyer's request for Meyer to view Newton's work.

9.     What had started out as an apparent dream come true for Newton -- of Meyer undertaking to act as Newton's talent agent representing Newton on two of Newton's films, "Nicole & O.J." and "The Will to Resist" -- became a nightmare as a result of Meyer's serious undisclosed conflict of interest, misrepresentations, and false promises. Meyer and Newton did not sign a formal written talent agent agreement, but as illustrated above in the phone conversation of September 4, 2017, and through further statements and conduct by Meyer, as discussed below, Meyer – with a reputation as one of the most powerful super agents ever – affirmatively and purposefully led Newton to believe that Meyer was providing representation and advice to him as a talent agent to obtain financing and distribution for Newton's films, "Nicole & O.J." and "The Will to Resist." Meyer made those representations both orally and in writing. Newton, to his damage, reasonably relied upon Meyer's offer to act as talent agent by placing the fate of his films and his career in the hands of Meyer.

10.     Unbeknownst to Newton, Meyer had an undisclosed conflict of interest that, over time, would induce him to breach his fiduciary duty to faithfully seek financing and distribution deals for Newton's two films. That conflict of interest arose from Meyer's pre-existing inappropriate relationship with actress Jane Doe,[1] who was set to star in "Nicole & O.J." Meyer placed his own interest in manipulating Jane Doe above his fiduciary duties owed to Newton and

---

[1] Jane Doe is a pseudonym.

sacrificed Newton's films and career on the altar of self-preservation. Along the way, Meyer's covert drive for self-protection led him to become actively involved in covering up and facilitating the abusive relationship that other titans of the film industry had had with Jane Doe ("the Ratner Group"). Meyer betrayed Newton by using Newton's movie "Nicole & O.J." as bait to keep Jane Doe sufficiently convinced that she was going to get the starring film role she so passionately wanted so that Jane Doe could be tricked into entering into an unconscionable settlement agreement with the Ratner Group in which Meyer was surreptitiously and fraudulently inserted as a released party in an attempt to extinguish his liability to her.

11.     Instead of fulfilling his fiduciary duty to Newton, Meyer used deception to draw Newton into entering a highly flawed and risk-laden agreement for "Nicole & O.J." with the members of the Ratner Group, by falsely representing their and his true intentions, and by stating repeatedly and falsely that Newton's film was being fully financed when Meyer knew in reality that Meyer and the members of the Ratner Group had no intention of actually doing so.

12.     Throughout the Summer and Fall of 2017, for his own benefit, Meyer aided and abetted the cover up of the Ratner Group's sexual abuse of Jane Doe, advising and persuading Newton and representing to Newton that the agreement would be to his benefit, when Meyer knew that such an agreement bore a substantial risk to Newton's career, his reputation, his current films and future projects. As a result of Meyer's breach of fiduciary duty and fraud, and Newton's reliance on Meyer's affirmatively fraudulent statements and omissions of material facts, Newton's films "Nicole & O.J." and "The Will to Resist", have been badly, and perhaps fatally, damaged, and Newton has suffered financial loss, destruction of his reputation in the film industry, as well as resulting serious emotional distress.

## THE PARTIES

13.     Newton is an individual and a resident of the United Kingdom. Newton is an award-winning film director, producer, and screenwriter.

14.     Meyer is an is an individual and a resident of the State of California. At all relevant times herein, Meyer was Vice Chairman and a managing agent of Defendant NBCUniversal.

15.     NBCUniversal is a limited liability company formed under the laws of Delaware and maintains its corporate headquarters at 30 Rockefeller Plaza, New York City, New York 10112. The sole member of NBCUniversal is NBC Universal, LLC, a limited liability company organized under the laws of the State of Delaware. The members of NBC Universal, LLC are:

(i)     Comcast Navy Acquisition, LLC, a limited liability company organized under the laws of the state of Delaware. The sole member of Comcast Navy Acquisition, LLC is Comcast Corporation, which is incorporated in Pennsylvania and has its principal place of business in Philadelphia, Pennsylvania.

(ii)    Comcast Navy Contribution, LLC, a limited liability company organized under the laws of the state of Delaware. The members of Comcast Navy Contribution, LLC are:

a.     Comcast SportsNet New England Holdings, LLC, a limited liability company organized under the laws of the state of Delaware, whose members are: (1) Comcast SportsNet NE Holdings, Inc., which is incorporated in Delaware and has its principal place of business in Philadelphia, Pennsylvania; and (2) CSNNE Partner, LLC, a limited liability company organized under the laws of the state of Delaware, whose sole member is Comcast Holdings Corporation, which is incorporated in

Pennsylvania and has its principal place of business in Philadelphia, Pennsylvania.

b.      Comcast SportsNet Philadelphia Holdings, LLC, a limited liability company organized under the laws of the state of Delaware, whose members are: (1) Comcast Holdings Corporation, which is incorporated in Pennsylvania and has its principal place of business in Philadelphia, Pennsylvania; and (2) Comcast Spectator Holding Company, LLC, a limited liability company organized under the laws of the state of Delaware, whose sole member is Comcast Holdings Corporation, which is incorporated in Pennsylvania and has its principal place of business in Philadelphia, Pennsylvania.

c.      Versus Holdings, LLC, a limited liability company organized under the laws of the state of Delaware, whose members are: (1) Comcast Holdings Corporation, which is incorporated in Pennsylvania and has its principal place of business in Philadelphia, Pennsylvania; and (2) E! Holdings, Inc., which is incorporated in Delaware and has its principal place of business in Philadelphia, Pennsylvania.

d.      Comcast CHC, LLC, a limited liability company organized under the laws of the state of Delaware, whose sole member is Comcast Holdings Corporation, which is incorporated in Pennsylvania and has its principal place of business in Philadelphia, Pennsylvania.

e.      Comcast Contribution Holdings, LLC, a limited liability company organized under the laws of the state of Delaware, whose sole member is

Comcast Corporation, which is incorporated in Pennsylvania and has its principal place of business in Philadelphia, Pennsylvania.

    f.    E! Holdings, Inc., which is incorporated in Delaware corporation and has its principal place of business in Philadelphia, Pennsylvania.

(iii)    NBCUniversal Enterprise Inc., which is incorporated in Delaware and has its principal place of business in Philadelphia, Pennsylvania.

(iv)    Comcast DW Holding, Inc., which is incorporated in Delaware and has its principal place of business in Philadelphia, Pennsylvania.

(v)    Comcast CCW Holdings, LLC, a limited liability company organized under the laws of the state of Delaware. The members of Comcast CCW Holdings, LLC are:

    a.    Comcast Navy Acquisition, LLC, a limited liability company organized under the laws of the state of Delaware whose sole member is Comcast Corporation, which is incorporated in Pennsylvania and has its principal place of business in Philadelphia, Pennsylvania.

    b.    Comcast Snap Holdings, Inc., which is incorporated in Delaware and has its principal place of business in Philadelphia, Pennsylvania.

(vi)    Comcast Snap Holdings II, LLC, a limited liability company organized under the laws of Delaware. The members of Comcast CCW Holdings, LLC are:

    a.    Comcast Navy Acquisition, LLC, a limited liability company organized under the laws of the state of Delaware whose sole member is Comcast Corporation, which is incorporated in Pennsylvania and has its principal place of business in Philadelphia, Pennsylvania.

    b.    Comcast Snap Holdings, Inc., which is incorporated in Delaware and has

its principal place of business in Philadelphia, Pennsylvania.

(vii)    SNL Entertainment Holdings, Inc., which is incorporated in Delaware and has its principal place of business in Philadelphia, Pennsylvania.

## JURISDICTION AND VENUE

16.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. There is complete diversity.  Newton is an alien citizen of the United Kingdom. Defendant Meyer is a citizen of the State of California. Defendant NBCUniversal is a citizen of the States of Delaware and New York, and Defendant NBCUniversal's sole member is NBC Universal, LLC, which is a citizen of Delaware.  NBC Universal, LLC has seven members: (i)   Comcast Navy Acquisition, LLC is a citizen of the State of Delaware (the sole member of Comcast Navy Acquisition, LLC is Comcast Corporation, which is a citizen of Pennsylvania); (ii) Comcast Navy Contribution, LLC is a citizen of the State of Delaware (the members of Comcast Navy Contribution, LLC are six entities, each of which are citizens of the State of Delaware, and five of those entities have members that are citizens of Pennsylvania or of the States of Pennsylvania and Delaware); (iii) NBCUniversal Enterprise Inc. is a citizen of the States of Delaware and Pennsylvania; (iv) Comcast DW Holding, Inc. is a citizen of the States of Delaware and Pennsylvania; (v) Comcast CCW Holdings, LLC is a citizen of the State of Delaware (the members of Comcast CCW Holdings, LLC are Comcast Navy Acquisition, LLC, which is a citizen of the State of Delaware and whose sole member is Comcast Corporation, which is a citizen of the State of Pennsylvania, and  Comcast Snap Holdings, Inc., which s a citizen of the States of Delaware and Pennsylvania; (vi) Comcast Snap Holdings II, LLC is a citizen of the State of Delaware (the members of Comcast Snap Holdings II, LLC are Comcast Navy

Acquisition, LLC, which is a citizen of the State of Delaware  and whose sole member is Comcast Corporation, which is a citizen of Pennsylvania, and Comcast Snap Holdings, Inc., which is a citizen of Delaware and Pennsylvania); and (vii) SNL Entertainment Holdings, Inc. is a citizen of the States of Delaware and Pennsylvania.

17.    This Court has personal jurisdiction over Defendant NBCUniversal because NBCUniversal has its principal place of business in New York and is a corporation organized under the laws of the State of New York.

18.    This Court has personal jurisdiction over Defendant Meyer under *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) because Defendant Meyer purposefully reached out from California and availed himself of New York State by doing business in New York, spending significant time working in New York State as Vice Chairman of Defendant NBCUniversal and maintaining an office in New York City.  Newton, from his dealings with Defendant Meyer, knew that Defendant Meyer was spending significant amounts of time working in New York State as Vice Chairman of Defendant NBCUniversal which required that he have an office in New York State.  Throughout his Vice-Chairmanship, Defendant Meyer would shuttle between his office at Universal Studios in California and Defendant NBCUniversal's headquarters in New York City. In New York City, Defendant Meyer had a suite at the Mandarin Oriental. Out of a mass of telephone calls between Defendant Meyer and Newton during the period February 2017 and November 2019, many took place whilst Defendant Meyer was in New York on business, with Newton often calling the Mandarin Oriental, asking for "Ron Meyer's suite" and being put through without hesitation.

19.    Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because per 28 U.S.C. § 1391(b)(3) this is an action that may not be brought in any other district

and the Court has personal jurisdiction over the Defendants.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

20.     On or about December 9, 2016, at Meyer's request, Jane Doe sent him Newton's script entitled "The Will to Resist." On or about December 18, 2016, Meyer telephoned Jane Doe, who put the call on speakerphone. Newton heard Meyer tell Jane Doe no fewer than four times, "The script is wonderful." Meyer further exclaimed, "everyone will want to be in this movie," and "this film will get made." During a call that day with Newton at Meyer's invitation, Meyer offered Newton his advice and assistance in getting the project financed, made, and distributed, and said "if anyone wants my opinion on the script have them call me".

21.     On or about February 2, 2017, Meyer invited Jane Doe and Newton to his office at Universal Studios. During the meeting, which took place on or about February 6, 2017, Meyer repeated his praise for Newton's "The Will to Resist" script and offered his help to get it produced. Meyer also showed interest in Newton's project "Nicole & O.J." and offered to read the script. Meyer invited Newton to contact him directly any time for his help and advice on any of his projects.

22.     Based upon this meeting at Universal Studios and subsequent telephone conversations with Meyer and actions by Meyer, Newton reasonably believed that Meyer was offering to act as Newton's talent agent and that Meyer was a very powerful figure in the industry, someone who had accumulated his power and influence in the industry through constant expansion and cultivation of his vast global network of entertainment industry contacts. Newton reasonably believed that Meyer often received his "compensation" for his services in identifying, representing, and promoting up and coming creative talent like Newton in the form of expansion of his network -- an invaluable asset to entertainment industry kingpins like Meyer in growing their power and

wealth. Thinking this was the "big break" he'd always worked towards, Newton quite willingly agreed to put his career and future in the film industry in Meyer's more than capable hands. Meyer had effective control of Newton's film efforts.

23.     Newton relied upon Meyer's statements praising Newton regarding his scripts "The Will to Resist," and "Nicole & O.J.," and Newton's talent as a film maker and screen writer. Newton also relied upon Meyer's express promises to get both films financed, made, and distributed globally, and about his expert predictions that both films would achieve great critical commercial success.

24.     What Newton did not know at that time -- and could not have known at that time-- was that, in fact, Meyer was conflicted in his ability to faithfully, loyally, and effectively act as Newton's talent agent to obtain financing, completion, and global distribution of Newton's films, and to do so in a way that would enhance and launch Newton's developing, award-winning career into a whole new universe as an "A list" film maker.  In the midst of reviewing Newton's work, Meyer told him "You're the new Stanley Kubrick".

25.     Meyer's conflict arose out of two sets of abusive "me-too" relationships with Jane Doe: one perpetrated and covered up by Meyer himself; the other by a group of industry titans who were also abusing and passing Jane Doe around so as to impress or reward each other with.  These abusive relationships would pose existential danger for Meyer and some of his powerful colleagues in the global entertainment industry.

26.     The first abusive "me-too" relationship that threatened Meyer's wealth and power was Meyer's own secret and abusive relationship with Jane Doe, who had been the victim of Meyer's sexual misconduct and manipulation beginning when Meyer recruited Jane Doe, when she was only nineteen and Meyer, a married man and father of a well-known celebrity daughter,

was believed to be in his late 60s.  Between then and the termination of his employment by NBCUniversal in August 2020, Meyer had been living a double life, going to great lengths to project a public image of integrity, while concealing a life of having exploited and manipulated Jane Doe's dreams of being a movie star into a tool of control.  Meyer's relationship with Jane Doe was not what Newton thought it was, with Meyer referring to Jane Doe as his friend.

27.     The second set of abusive "me-too" relationships threatening Meyer's power was the abusive "me-too" relationships that entertainment industry executives comprising the Ratner Group had with Jane Doe, including Kevin Tsujihara, then CEO of Warner Bros. Entertainment, Australian billionaire James Packer, film executive Brett Ratner, and independent studio boss Avi Lerner.

28.     As alleged below, Meyer would choose loyalty to his own self-preservation over faithful adherence to his fiduciary duties owed to Newton by virtue of Meyer's role as Newton's talent agent and career advisor.

29.     On or about February 10, 2017, Meyer telephoned Newton and praised his script "Nicole & O.J." Meyer also praised "The Will to Resist" but said that he would not recommend it for production at Universal if Jane Doe was cast in a leading role. At the time Newton believed that Meyer's unwillingness to make "The Will to Resist" at Universal was due to Jane Doe's lack of credits. However, the real reason Meyer wanted to keep any film starring Jane Doe away from his studio: Meyer's desire to keep Jane Doe and his abusive "me-too" relationship with her at a safe distance from Meyer's own career at NBCUniversal.

30.     Instead of getting "The Will to Resist" produced directly by NBCUniversal, Meyer offered to recommend Newton's script to renowned producers Joel Silver, Mike Lobell and Mike Medavoy. Newton alleges on information and belief that each of these producers asked Meyer

whether NBCUniversal would distribute Newton's film and that Meyer declined as long as Jane Doe was cast in a leading role.

31.   On or about May 24, 2017, Jane Doe retained a law firm to pursue sexual misconduct and other claims against a group of high-profile film industry individuals that included renowned film producer Brett Ratner, Australian billionaire James Packer, Warner Bros CEO Kevin Tsujihara, and independent studio boss Avi Lerner (as noted above, collectively referred to as the "Ratner Group").

32.   In a telephone conversation on or about June 16, 2017, in a bid to deter Jane Doe from commencing legal action against the Ratner Group, Meyer offered to help Jane Doe secure a leading role in the film "Hellboy," which had been promised by the Ratner Group as part of their settlement negotiations with Jane Doe. Meyer contacted members of the Ratner Group and subsequently spoke to the producer of "Hellboy," Larry Gordon, following which Meyer called Jane Doe and gave her false hope that she would be cast in the role. Newton was a witness to and heard that telephone conversation on a speakerphone. Meyer subsequently contacted Newton and expressed his concern that Jane Doe would be pressured by her lawyers to do something "foolish" and file a lawsuit. Meyer counseled that such a move would end her film career. Newton said he would relay that advice to Jane Doe. Unbeknownst to Newton, Meyer's concern about Jane Doe involving lawyers was motivated by fear that Jane Doe would tell lawyers about his own "me-too" relationship with Jane Doe. Meyer told Newton that he (Meyer) had made the Ratner Group aware of Newton's film project "Nicole & O.J.", whose script Meyer had praised and that they were interested in financing it on its merits with the added benefit that it could be offered to Jane Doe instead of the role in "Hellboy" that had been promised to her. But Newton declined to discuss Meyer's proposition further, telling him that Jane Doe, who is on the autism spectrum, had her

heart set on the promised role of "Hellboy."

33.     After purportedly contacting members of the Ratner Group, Meyer told Jane Doe that he had contacted the producer of "Hellboy." Meyer made representations to Jane Doe about her chances of landing the role that Meyer knew to be false, designed to give her false hope and thereby keep her from filing her lawsuit. By communicating an express threat to Jane Doe's career, and dangling the Ratner Group's purported interest in financing "Nicole & O.J." as an inducement to Newton, Meyer began to actively aid and abet the Ratner Group in their attempt to hide their sexual misconduct of Jane Doe, and in the process, to hide Meyer's own abusive sexual relationship with Jane Doe. Motivated by a mutual interest in silencing Jane Doe, Meyer became an aider and abettor, co-conspirator in the Ratner Group's manipulation, exploitation, and control over Jane Doe.

34.     On or about July 14, 2017, Newton received an email request from Meyer's assistant to return Meyer's call, which he did.  In that conversation, Meyer asked Newton how much he could produce "Nicole & O.J." for, to which Newton responded that he could produce the film for $10 to $12 million below-the-line. Including above-the-line costs such as A-list stars, Meyer knew the total to be around $20 million.  Meyer, who had read and praised Newton's script in February 2017, said the figure was "very reasonable," and asked Newton to re-send the script to him, which Newton did, believing that Meyer was acting to get "Nicole & O.J." produced and advance Newton's career. Then, according to Meyer, he forwarded Newton's script to members of the Ratner Group, pivoting from acting on Newton's behalf, as Newton's agent and career advisor, to using Newton and "Nicole & O.J." to keep Jane Doe under control and to keep the Ratner Group's enterprise safe and ongoing.

35.     On or about July 24, 2017, Meyer called Newton from Tokyo and informed him

that Ratner had heaped praise on Newton's script for "Nicole & O.J."  Meyer, referring to Packer as "Jamie," again stated that Jamie wished to finance it and that it could be offered to Jane Doe instead of the role in "Hellboy" that had been promised to her. Once again, Newton told Meyer that as long as Jane Doe still held hopes of getting the "Hellboy" role, Newton could not accept Packer's offer.

36.     On or about August 2, 2017, upon learning that the female lead in "Hellboy" had been given to another actress, Jane Doe was about to file a lawsuit against the Ratner Group. Newton was a witness by speakerphone to Meyer's subsequent conversation with Jane Doe. She was devastated and in tears. Meyer repeatedly urged Jane Doe not to file suit against the Ratner Group, with the words "You don't have to do this, you've got O.J." Meyer was using this promise to manipulate Jane Doe into calming down, repeating three more times, "You've got O.J."

37.     On or about August 4, 2017, Jane Doe received a final draft complaint against Meyer's co-conspirators from her attorney, for approval. The complaint included Warner Bros as a co-defendant. Subsequently, motivated by his desire to protect the Ratner Group and himself, Meyer contacted Newton in a desperate bid to stop Jane Doe from filing suit. Meyer told Newton that "Jamie" [Packer] had offered to finance "Nicole & O.J.," and that Packer's co-defendant and representative Ratner was requesting a meeting with Newton at the Beverly Hills Hotel on August 7, 2017, to agree on the terms of a film financing deal. Meyer requested that Newton again re-send the scripts for both "Nicole & O.J." and "The Will to Resist", which Newton did on August 5, 2017.

38.     On or about August 7, 2017, Newton met with Ratner at the Beverly Hills Hotel, as instructed by Meyer. Jane Doe also attended the meeting. Although Meyer had represented to Newton that Packer's offer to finance "Nicole & O.J." entailed an investment by Packer of the full

amount required to produce the film, which would have been a total amount reaching $20 million after adding the above-the-line (stars, filmmakers and development costs) to the $10 million to $12 million below the line figure that Meyer had said was "very reasonable", Ratner instead proposed something entirely different: a plan that would *purportedly enable* the full financing of the film based on the value of attaching Ratner's name as a producer of the film. Ratner's offer was a "bait and switch" in relation to the proposed deal Meyer had originally described. But Meyer subsequently advised and persuaded Newton that Ratner's offer, which included an initial $1m investment to shoot a few scenes in the film, would be of significant benefit to Newton because of the value that Ratner's name and standing in the industry would add to the project. Meyer emphasized that Ratner's offer, if accepted, would ensure that the film would get made, by giving it significant value and credibility. Meyer wielded considerable influence over Newton, because of Meyer's ultra-high standing and experience in the film industry, both as a super-agent and corporate leader; Meyer's expressed enthusiasm for Newton's film projects and career; and Meyer's representations and assurances that he was primarily interested in advancing Newton's films and career.

39.     In reasonable reliance on Meyer's advice and persuasiveness, Newton agreed to accept Ratner's offer. Newton was led to believe by Meyer that it would get Newton's "O.J. film" made and distributed. As Newton would learn much later, however, Ratner's substantially reduced offer was part of a fraudulent scheme by Meyer and the members of the Ratner Group to use Newton and his film to deceive Jane Doe into thinking she would be getting a starring role in "Nicole & O.J." and thereby manipulate Jane Doe into foregoing suing the Ratner Group and releasing Meyer himself from liability to her in the process.

40.     Newton, without legal representation, was coerced by members of the Ratner Group

and their counsel into becoming part of Jane Doe's Settlement Agreement during a mediation on August 9, 2017 that Newton had attended as merely a support person for Jane Doe, rather than as a participant. At the mediation, the participants of the mediation pressured Newton to agree to incorporate into Jane Doe's Settlement Agreement an obligation to enter into a separate film financing agreement on terms which were considerably less favorable than what Ratner had offered and Newton, on the advice of Meyer, had accepted at the Beverly Hills Hotel meeting on August 7, 2017. During the mediation, Ratner leaped at Newton and threatened to punch him in the face if he didn't sign the Settlement Agreement. On information and belief, the Ratner Group had planned in advance to pressure Newton into signing the Settlement Agreement during the mediation, and Meyer knew about it all along, but violated his fiduciary duty owed to Newton by concealing the scheme from Newton. In fact, unbeknownst to Newton, Jane Doe and Jane Doe's counsel, Meyer was fraudulently and surreptitiously inserted into the Settlement Agreement under a pseudonym by Ratner's counsel, as a released party. Under threat of violence by Ratner, Newton signed the Settlement Agreement. The result was that Newton had a much less favorable film deal than he had previously been offered by Ratner at the Beverly Hills Hotel, and even more substantially less favorable than the full $20m Meyer had earlier told Newton he would receive to make his film. On information and belief, Meyer and the members of the Ratner Group were offering Newton just enough to keep him "on the line" and thinking that they were going to get his O.J. film produced and distributed, so that in turn they could continue to use Newton and his O.J. film as bait to keep Jane Doe on the line as well.

41.    On or about August 17, 2017, Meyer's co-conspirator Ratner refused to honor even the seriously diluted financing and production arrangements accepted under duress by Newton at the Mediation, and instead instigated an intense dispute with Newton that lasted until November

9, 2017, when it appeared to be resolved. During this period, Meyer involved himself in the dispute, pretending to act for Newton's best interest. In reality, Meyer was acting only to protect the interests of the Ratner Group and himself to control and silence Jane Doe, while having no intention of actually causing "Nicole & O.J." to be fully financed, produced and distributed.

42.    During the lawfully recorded phone conversation of September 4, 2017, referred to in paragraph 2 above, Meyer told Newton and Farr that Ratner's purported issue with Ratner's commitment to involve himself as a financier and producer of "Nicole & O.J." stemmed from Ratner's subsequent belief that his involvement in a film that promoted the thesis that O.J. Simpson was innocent, but framed, would cause him considerable chastisement amongst the Jewish community, which was reportedly angry that O.J. Simpson had killed Ron Goldman, who was Jewish. Meyer, who had "green lighted" major films directed by Ratner during Meyer's long reign as President and COO of Universal Pictures, proposed to Ratner and Newton and Farr that they change the deal for "Nicole & O.J." again. Meyer asked Farr "If I could get that done, would that be satisfactory?". When Farr responded that Ratner would need to remain attached as a producer as he had originally agreed and that he would need to take calls from prospective investors, Meyer replied, "I would make sure he does. That I would have him do".

43.    Subsequently, Meyer came back to Newton with an alternative proposal, that would remove Ratner's name from the project and instead would provide for Ratner to be producer on Newton's prestige epic project, "The Will to Resist", which Meyer had substantially praised. Meyer recommended that Newton accept this materially different and inferior deal to enable the production of "The Will to Resist" through Universal Pictures. Meyer represented to Newton that attaching Ratner's name to "The Will to Resist" would attract stars, making the film viable for NBCUniversal.

44.     On or about October 17, 2017, Meyer wrote an e-mail to Newton stating "Let's get this closed and move on to positive things, especially making your film". The "this" Meyer was referring to was the proposed settlement agreement with Ratner and the other members of the Ratner Group. The film Meyer was referring to was "The Will to Resist."

45.     On or about November 1, 2017, the Los Angeles Times published an article headlined, "Six Women accuse filmmaker Brett Ratner of Sexual Harassment or Misconduct." Virtually overnight, Ratner's name became worthless in the industry, and as a result, became an impediment, rather than an advantage, in getting "Nicole & O.J." or "The Will to Resist" financed, made, and distributed. Meyer informed Newton that Ratner's counsel, Singer, who was also lead counsel for Packer, Tsujihara, and Lerner, wished to meet to resolve the issue.

46.     On or about November 9, 2017, Newton, persuaded by Meyer's promises made during the phone call with Newton and Farr on September 4, 2017, that "We'll find ways to get this movie financed and distributed", "Let's go sell it" and "I want my company to see it", agreed in principle to a revised Settlement Agreement with Ratner, Packer, Tsujihara and Lerner that would provide funds to shoot part of "Nicole & O.J" to enable ultimate funding of the whole film and its distribution via Meyer's promised efforts.

47.     On or about November 18, 2017, Meyer told Newton that Warner Bros CEO Kevin Tsujihara had informed the Board of Warner Bros about Jane Doe's claim and that inclusion in the revised Settlement Agreement of a pre-written statement by Jane Doe -- that Jane Doe's sexual relationship with Tsujihara was consensual -- was a condition of Tsujihara keeping his job as CEO. Meyer gave Newton's cell phone number to Tsujihara, and Tsujihara called Newton to confirm what Meyer had told about the Warner Bros Board's insistence on an exculpatory statement by Jane Doe, on the condition that it would only be used to prevent a threatened publication of a story

on their relationship. Meyer told Newton that in order for the deal to happen, and the funds to shoot part of "Nicole & O.J." to be released, Jane Doe and Newton had to agree to Jane Doe's pre-written statement. Meyer, acting as Newton's agent, failed to forewarn Newton of the probable adverse consequences of the pre-written statement -- that the statement would enable the publication of a story identifying Jane Doe by name and falsely presenting her as a consensual party and not a victim of abuse of power instead of preventing the publication of a story.

48.     That is precisely what happened in March 2019, when the Hollywood Reporter relied on Jane Doe's pre-written statement to not only publish a story, but to identify Jane Doe by name in the story. Since Jane Doe's starring role in "Nicole & O.J." had already been publicized, publication of the story identifying Jane Doe damaged Newton's career and reputation and stopped the completion of "Nicole & O.J." in its tracks.  On information and belief, Meyer, who had access to sophisticated professional public relations and had decades of personal experience dealing with the media, had to have known, when he advised Newton to agree to the pre-written statement, that such a statement from Jane Doe would provide a publisher with its required confirmatory source for its threatened story, which identified Jane Doe and painted her as a consensual partner in sex, rather than the "me-too" victim she actually was. On information and belief, in addition to protecting Tsujihara and members of the Ratner Group from public disclosure and career destruction, Meyer had an additional personal agenda for persuading Newton to follow this disastrous course of action: Jane Doe's publicly saying that her relationship with Tsujihara had been consensual and she was not a "me-too" victim, gave Meyer additional insurance that Jane Doe would not be believed if she sued Meyer over his own abusive "me-too" relationship with Jane Doe.

49.     On or about November 28, 2017, Meyer sent an email to Newton stating, "Marty

[referring to Ratner's counsel Martin Singer] says you will get a signable document/latest tomorrow." Meyer was referencing a version of the Settlement Agreement that included the pre-written statement by Jane Doe.

50.     On or about December 21, 2017, on Meyer's advice and representations Newton signed the revised Settlement Agreement, and Meyer said he was relieved that Jane Doe and Newton's dispute with Ratner had been resolved. On or about December 22, 2017, in an email to Newton, Meyer referred to the signing of the revised Settlement Agreement as "A Christmas Miracle."

51.     On or about January 2, 2018, Meyer sent Newton an e-mail saying, "Can't wait to see your well-earned movie". As with all of his other e-mails to Newton, that e-mail was sent from Meyer's official NBCUniversal e-mail account.

52.     On or about between January 2018 and May 2018, Newton directed and edited the scenes from "Nicole & O.J." that were financed on Meyer's advice by the revised Settlement Agreement. On or about April 4, 2018, Meyer called Newton to congratulate him on the scenes, saying, "It looks like you spent $25m".

53.     On or about May 4, 2018, Meyer advised Newton to publicize "Nicole & O.J." at the Cannes Film Festival and offered to recommend the project to the now late Paul Bloch, then Chairman of industry-renowned publicists, Rogers & Cowan. Meyer's recommendation resulted in an article on the film in people.com.

54.     On or about May 29, 2018, Newton emailed Meyer to inform him that he had arrived in Los Angeles. Meyer responded by email that he had budget meetings and "unless you need me, will give you a call Thursday."

55.     Newton alleges on information and belief that on or about July 2018 Meyer became

concerned that Avi Lerner, one of the Ratner Group members, was breaking confidentiality of the settlement agreement and spreading highly damaging rumors about Jane Doe that stopped a potential distribution deal for "Nicole & O.J." with a major film distributor in its tracks. In particular, Meyer was concerned that Lerner had told Sylvester Stallone about Jane Doe. Meyer was a long-time friend and former agent of Stallone who, as a co-founding "power agent" at Creative Artists Agency, had allegedly secured Stallone $20 million acting deals.

56.     In or about September 2018, when Meyer feared a resurgence of a dispute between members of the Ratner Group, on the one hand, and Jane Doe and Newton, on the other hand, Meyer advised Newton to post-produce the material that had been filmed and screen it for him at Universal Studios.

57.     Acting on Meyer's advice, between approximately September 2018 and January 2019, Newton post-produced the first 15 minutes of "Nicole & O.J."

58.     On or about January 17, 2019, Meyer invited Newton to screen the material in the Executive Screening Room at Universal Studios.

59.     On or about January 24, 2019, Newton screened the material for Meyer at Universal Studios. Throughout the screening, Meyer congratulated Newton and called him "the new Stanley Kubrick." Meyer said, "this will make money." Although Meyer in the phone conversation of September 4, 2017, had told Newton and Farr "I want my company to see it", he did not show it to anyone at NBCUniversal. Instead, Meyer advised Newton as to which companies he should approach with the film, and he said that if anyone wanted Meyer's opinion, "get them to call me." Meyer also advised Newton that Universal could make "The Will to Resist" then, but if Newton waited until the release and success of "Nicole & O.J.," Meyer would be able to secure Newton greater creative control over the project. In reasonable reliance on Meyer's advice and Meyer's

expert opinion that "Nicole & O.J." will make money," Newton told Meyer that he would follow his advice and wait until after "Nicole & O.J." had been completed and distributed before making "The Will to Resist" at Universal.

60.     On or about March 6, 2019, the Hollywood Reporter ran a frontpage story regarding then Warner Bros CEO Tsujihara headlined, "I need to be careful": Texts reveal Warner Bros CEO promoted actress amid apparent sexual relationship." The story named Jane Doe as the actress.

61.     On or about March 6, 2019, after speaking with the Hollywood Reporter, Singer, counsel to Meyer's co-conspirators, wrote to Jane Doe's attorney to insist that Jane Doe issue the pre-agreed obligatory statement.

62.     On or about March 6, 2019, Meyer forwarded Newton a chain of emails demonstrating that Meyer was working together with Tsujihara's attorney in regard to securing Jane Doe's statement required by the revised Settlement Agreement.

63.     On or about March 7, 2019, Meyer proposed to Jane Doe that she issue a second statement. This statement was not obligated by the revised Settlement Agreement, yet Meyer talked Jane Doe into making the second statement by introducing Jane Doe to Meyer's publicist, Howard Bragman.

64.     On or about March 8, 2019, Bragman emailed Jane Doe a draft statement proposing that she would state "There are real victims of #MeToo in our industry and my heart goes out to them. I applaud them and support them—but, I'm just not one of them". This statement would subject Jane Doe to ridicule and cause grave damage to Newton's film and his career, since his film "Nicole & O.J." was very publicly tied to Jane Doe as its star.

65.     On or about March 11, 2019, Jane Doe's attorney emailed Jane Doe to warn her against making this second statement and said, "I want you to see how bad the bad guys want you

to make that statement. Ron and Kevin [Tsujihara] are working together."

66.     On or about March 13, 2019, Jane Doe's second statement was published in the press, further fueling the scandal and subjecting Jane Doe to worldwide ridicule. The statement led to the resignation of Tsujihara on March 18, 2019, and further industry and public condemnation of Jane Doe.

67.     On or about March 11, 2019, Hollywood Reporter journalist Tatiana Siegel, who wrote the story about Jane Doe, informed Jane Doe that the story ran because Jane Doe confirmed in her statement that she had had sexual activity with Kevin Tsujihara, and that it was consensual.

68.     On or about March 12, 2019, Siegel confirmed to Newton by phone that Jane Doe's statement was the confirmatory source the Hollywood Reporter needed to run the story, and also the basis for revealing Jane Doe's identity in the story, which would not have been revealed in the absence of the statement.

69.     On or about March 13, 2019, the Hollywood Reporter ran an article stating that "Speaking on the condition of anonymity, one top executive at another media giant confirms that Jane Doe is a "friend" whom he met several years ago through a member of the Hollywood Foreign Press Association and acknowledges that he attempted to intercede on her behalf". The "top executive" referred to at another media giant was Meyer at NBCUniversal. In Meyer providing the press with information, he became a confirmatory source further subjecting Jane Doe to ridicule. The article's reference to Jane Doe as a "friend" infers that Meyer had admitted he had had a sexual relationship with her.

70.     The damage to Newton and "Nicole and O.J." and Newton's career from Meyer's advice to Newton to agree to the pre-written statement and the resulting Hollywood Reporter stories was immediate and potentially career-ending. On or about March 5, 2019, Meyer had

informed Newton that he had recommended "Nicole & O.J" to Jason Blum, head of Blumhouse Productions, and that Blum was expecting Newton's call. Blumhouse is a leading producer of motion pictures whose productions, distributed by Universal Pictures, have included the highly controversial and financially successful "Black KKKlansman".

71.     On or about March 6, 2019, by way of Meyer's recommendation, Newton had screened the material for Blum. Blum had appeared impressed and had told Newton he would discuss the film with Meyer.  Blum asked Newton whether Meyer was offering distribution by Universal. Newton responded that it was for Blum's discussion with Meyer.

72.     However, on or about March 8, 2019, which after the Hollywood Reporter had run the story identifying Jane Doe as a consensual sex partner who has allegedly used sex to advance her career, Blum told Newton by phone that while he found the material compelling, it was not his genre, and for that reason he would not be proceeding with the film. Not only had Blum been made aware by Meyer of the genre prior to the screening, Blum had indicated strong interest at the screening and had shown no objection to the genre. When Newton contacted Meyer to ask what had happened, Meyer was evasive before claiming that the true reason Blum had passed on "Nicole & O.J." was because of the scandal involving Jane Doe and Warner CEO Tsujihara.

73.     On or about March 13, 2019, two other production companies that had previously expressed strong interest in the project were no longer willing to consider the project because of the scandal involving Jane Doe.

74.     On or about April 4, 2019, further illustrating that Meyer was actively working to protect the interests of himself and members of the Ratner Group at the expense of the best interests of Newton and Jane Doe, Meyer forwarded an email, to Newton and Jane Doe, from Singer, attorney to Meyer's co-conspirators, in an overt effort to put pressure on Newton to dissuade Jane

Doe from doing a television interview.

75.     On or about April 10, 2019, Newton received a voice message from Georg Georgi, who was the agent to the actor playing O.J. Simpson in "Nicole & O.J.," Boris Kodjoe, a celebrity and very well connected in the industry. Prior to the scandal, Kodjoe had offered to speak with his contacts in order to complete the film and secure distribution. But on or about April 10, 2019, Kodjoe's agent, Georg Georgi, said in his voice message "Boris is unable to help you because he says you have lost your reputation."

76.     On or about May 10, 2019, Meyer told Newton that he would call distribution company chief Byron Allen and "tell him to do the movie" after Newton's meeting with Allen's Acquisitions Executive at the Cannes Film Festival.

77.     On or about May 30, 2019, Meyer informed Newton that he had spoken with Allen, who had promised to watch the 15-minute opening of "Nicole & O.J". When Allen consistently refused to take or return Newton's calls, Meyer told Newton that he could not understand why Allen would not call him again. Newton alleges on information and belief that this was not a truthful statement by Meyer.

78.     On or about June 9, 2019, in response to Newton's email, Meyer discussed the dire situation with Newton over the phone. Meyer, appearing quite anxious, said he would speak to members of the Ratner Group, and that Newton should keep him updated. Over the following two months, Meyer called Newton many times, from wherever Meyer was, sometimes from an aircraft, sometimes from Europe, and once from Beijing.

79.     On or about August 11, 2019, Jane Doe retained a new law firm to pursue claims against Meyer and members of the Ratner Group. When Meyer was subsequently notified of Jane Doe's claim, Meyer called Newton to complain that she was suing him. Meyer then went into a

rant, complaining, "that fucking cunt, I did nothing wrong. All I did was fuck her a couple of times. I did nothing wrong. That cunt. I'll take her down."

80.     In early November 2019, Newton called Meyer's office as had been his custom, but was told by Meyer's assistant that Meyer had been instructed by his counsel not to communicate with Newton. Newton subsequently was able to reach Meyer by phoning the Mandarin Oriental hotel in New York and asking to be put through to "Ron Meyer's suite". Meyer said that his counsel had told him not to speak with Newton because Newton had told Jane Doe about Meyer's "that fucking cunt" rant. Meyer told Newton that a mediation with Jane Doe was imminent and that afterwards "We'll sit down and have a coffee".

81.     Meyer's admission, calling Jane Doe a "fucking cunt", that "All I did was fuck her a couple of times" and "I'll take her down" not only shocked Newton but underlined a harsh truth: an abuse of power and sexual exploitation by Meyer. In retrospect, Newton had come to realize that Meyer's abusive sexual relationship had put Meyer in a conflict of interest; his efforts to save his own skin and his related efforts to save the skins of members of the Ratner Group conflicted with his fiduciary duties owed to Newton as Newton's talent agent. Meyer turned from diligently representing Newton and his films to willfully diverting Newton's films from promising projects with great commercial potential into cannon fodder to be sacrificed in order to save Meyer and the Ratner Group.

82.     Meyer's breach of trust and fiduciary duties to Newton and other misconduct have severely damaged Newton's film projects, "Nicole & O.J." and "The Will To Resist," making it questionable whether these once very promising projects will ever be made. These are the same projects that Meyer consistently praised as brilliant projects that would make money. And in the process, Meyer's betrayal of Newton has caused a destruction of Newton's reputation that may

never be restored.

## FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty)

83.     Newton repeats and re-alleges each and every allegation hereinabove as if fully set forth herein. To state a claim for breach of fiduciary duty, a plaintiff must allege (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damage proximately caused by the breach.

84.     Meyer and NBCUniversal, and each of them were, at all times relevant and remain, under the law of New York, fiduciaries to Newton by virtue of the totality of facts alleged above, in particular, that Meyer, acting in the course and scope of his actual or apparent authority on behalf of NBCUniversal as its Vice Chairman, agreed to represent Plaintiff as his actual or de facto talent agent to obtain financing and distribution of Newton's films, "Nicole & O.J" and "The Will to Resist."

85.     Newton reasonably relied upon the express promises of Meyer, on behalf of NBCUniversal, as alleged above, as well as on his belief that Defendants were truthfully stating and disclosing all material facts to Newton, in understanding and believing that Defendants had undertaken the role as Newton's talent agent. On that basis, Newton entrusted representation in relation to his films to Meyer, acting on behalf of NBCUniversal. Meyer had effective control of Newton's film efforts.

86.     Meyer, acting in the course and scope of his actual or apparent authority as Vice Chairman of NBCUniversal, had a serious undisclosed conflict of interest motivated by his selfish interest in protecting his own career and financial interests by keeping secret his abusive sexual relationship with Jane Doe. Meyer's conflicting self-interest caused him to place his own interests over his fiduciary duties owed to Newton to the point that Meyer decided to sacrifice Newton's films and careers in the film industry in order to save himself.

87.     The breaches of fiduciary duties by Meyer acting on behalf of NBCUniversal included all of the affirmative misrepresentations of material facts, as alleged above, as well as failure to disclose material facts, as alleged above, and the other misconduct Meyer engaged in, to cover up his own abusive relationship with Jane Doe, and as an aider and abettor and/or co-conspirator with members of the Ratner Group.

88.     Defendants' breach of fiduciary duties caused severe irreparable damage to Newton's films being represented by Defendants, to the point that films which Meyer had praised as being of imminently financeable, marketable, and profitable quality, have become such damaged goods that it is currently impossible for Newton to obtain financing, production, or distribution for them.

89.     As a direct and proximate result of the above conduct, Newton sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, loss of career opportunities, economic injuries and other direct and consequential damages.

90.     As a result of the foregoing, Newton is entitled to damages from Defendants in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**SECOND CAUSE OF ACTION**
**(Fraudulent Inducement)**

91.     Newton repeats and re-alleges each and every allegation hereinabove as if fully set forth herein. To state a claim for fraudulent inducement, a plaintiff must allege that (1) the defendant intentionally made a material misrepresentation of fact, (2) the defendant intended to defraud or mislead the plaintiff, (3) the plaintiff reasonably relied upon the misrepresentation, and (4) the plaintiff suffered damage as a result of such reliance.

92.     Meyer, acting in the course and scope of his actual or apparent authority as Vice

Chairman of NBCUniversal, promised to Newton that he would ensure that Newton's films, "Nicole & O.J" and "The Will to Resist" would be made, using his influence as a reputable super-agent and a powerful studio executive to arrange financing, production, and distribution of the films.

93.    Meyer intended that Newton would rely on his promises to finance, produce, and distribute the films and Newton did in fact reasonably rely on those promises, spending months in anticipation of working with Meyer that could have been profitably spent seeking ways to get the film made.

94.    Meyer never intended to perform on his promises as emphasized by Meyer in the lawfully recorded telephone call with Newton and Farr on September 4, 2017, only using them as a ploy to forestall a lawsuit by Jane Doe, a star of Newton's film "Nicole & O.J.", against Meyer and several other high-profile Hollywood executives for their sexual exploitation of Jane Doe. Meyer, from the start, harbored an intent to deceive Newton.

95.    Meyer never made good on his promises to get the films "off the ground" or take any substantial steps to do so or to ensure as he promised that "everyone will get their money back once Josh was able to start filming this movie". **Under New York law**, Meyer engaged in promissory fraud and Newton reasonable relied on Meyer's promises. As a result of Meyer's promissory fraud and Newton's reasonable reliance on it, Newton was damaged in that he and Farr forewent other opportunities to get their film projects financed, produced, and distributed.

96.    As a further result of Meyer's promissory fraud and Newton's reasonable reliance on it, Newton's film projects are now impossible to finance and produce, and Newton's past and future earning potential has been severely damaged.

97.    As a direct and proximate result of the above conduct, Newton sustained

tremendous damages, including, without limitation, emotional distress, damages to reputation, loss of career opportunities, economic injuries and other direct and consequential damages.

98.     As a result of the foregoing, Newton is entitled to damages from Defendants in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

99.     Newton repeats and re-alleges each and every allegation hereinabove as if fully set forth herein. To state a claim for negligent misrepresentation, a plaintiff must allege (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart accurate information to the plaintiff; (2) that the information actually imparted was incorrect; (3) reasonable reliance on the information; and (4) damages.

100.     As detailed above in the events of this case and specifically in connection with the fiduciary relationship that Meyer had with Newton, Meyer was in a special relationship with Newton.  Meyer, acting as Vice Chairman of NBCUniversal, made material misrepresentations of fact to Newton, as alleged in detail above. In the alternative to the allegations in the Second Cause of Action, Newton alleges that under New York law, Meyer made such misrepresentations of material fact without having a reasonable basis for believing in the truth and/or accuracy of such representations, and/or without conducting a reasonable investigation before making such representations.

101.     Meyer's pursuit of his self-interest caused him to act negligently and potentially recklessly in making the above alleged misrepresentations of material fact to Newton without having a reasonable basis for believing them to be true. This was not a matter of Meyer not performing promises as to future performance, but of Meyer's misrepresentations born of pursuit

of his self-interest. As detailed above in the events of this case and specifically in connection with the fiduciary relationship that Meyer had with Newton, Newton reasonably relied in good faith on his belief that Meyer was disclosing and accurately describing all material facts relating to Meyer's representation of Newton in relation to their films as alleged in detail above. Newton's reasonable reliance on what turned out to be Meyer's misrepresentations of material facts caused actual damages to Newton's films and career, monetary damages, and severe emotional distress.

102.    As a direct and proximate result of the above conduct, Newton sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, loss of career opportunities, economic injuries and other direct and consequential damages.

103.    As a result of the foregoing, Newton is entitled to damages from Defendants in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Newton demands judgment against Defendants as follows:

(i)     on the first cause of action for breach of fiduciary duty, a judgment against Defendants awarding to Newton damages in an amount to be determined at trial, but in any event, no less than $150,000,000, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)    on the second cause of action for fraudulent inducement, a judgment against Defendants awarding to Newton damages in an amount to be determined at trial, but in any event, no less than $150,000,000, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)    on the third cause of action for negligent misrepresentation, a judgment against Defendants awarding to Newton damages in an amount to be determined at trial, but in any event, no less than $150,000,000, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(iv)    such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Newton demands a trial by jury of all issues presented herein that are triable by a jury.

**Dated: New York, New York**
       **May 27, 2022**

                                        **Respectfully submitted,**
                                        **NESENOFF & MILTENBERG, LLP**
                                        ***Attorneys for Plaintiff Joshua Newton***

                                        **By: /s/ _Philip A. Byler_**
                                        **Philip A. Byler, Esq.**
                                        **Andrew T. Miltenberg, Esq.**
                                        **Diana R. Warshow, Esq.**
                                        **363 Seventh Avenue, Fifth Floor**
                                        **New York, New York 10001**
                                        **(212) 736-4500**
                                        **pbyler@nmllplaw.com**
                                        **amiltenberg@nmllplaw.com**
                                        **dwarshow@nmllplaw.com**