UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                              :
JOSHUA NEWTON,                                                :
                                                              :
                              Plaintiff,                      :
                                                              :            22 Civ. 540 (JPC)
              -v-                                             :
                                                              :            OPINION AND
RONALD MEYER and NBC UNIVERSAL MEDIA                          :            ORDER
LLC,                                                          :
                                                              :
                              Defendants.                     :
                                                              :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

In 2018, Defendant Ronald Meyer—then Vice Chairman of Defendant NBCUniversal Media LLC ("NBCU")—offered to help filmmaker Plaintiff Joshua Newton secure funding for two of his scripts. Thanks to Meyer's connections, Newton signed a deal to produce a few scenes for one of those scripts, "Nicole & O.J.", and Meyer urged Newton to preview those scenes for Hollywood producers. All the while, Meyer was allegedly hiding inappropriate relationships that he and other Hollywood executives had with an actress who was the anticipated star of Newton's film. After details of those relationships became public, all investor interest in "Nicole & O.J." vanished, and the film remains unmade to this day.

Newton brings this action against Meyer and NBCU for breach of fiduciary duty, fraudulent inducement, and negligent misrepresentation, invoking this Court's diversity jurisdiction. Before the Court are Defendants' motions to dismiss Newton's Third Amended Complaint. For the reasons discussed, the Third Amended Complaint does not contain sufficient factual allegations to adequately allege personal jurisdiction over Meyer. However, allowing discovery on the question of whether personal jurisdiction exists would be futile because the Third

Amended Complaint fails to state a claim against Meyer or NBCU, whose liability would rely on a theory of respondeat superior:  Newton fails to adequately allege the formation of a fiduciary relationship, that any of Meyer's statements were false or materially misleading, or that any reliance on Meyer's statements was reasonable.   Moreover, because Newton has already amended his complaint three times and was put on notice by Defendants as to the pleading deficiencies identified herein, the Court finds that further leave to amend would be futile.   Accordingly, both Defendants' motions are granted, and the case is dismissed with prejudice.

## I.  Background

### A.   Factual Allegations[1]

Newton met Meyer through an actress who will be referred to herein as "Jane Doe."  Third Am. Compl. ¶ 10.[2]   Unbeknownst to Newton, Meyer had a "pre-existing" "secret and abusive relationship" with Jane Doe.  *Id.* ¶¶ 20, 26.  On December 9, 2016, Meyer asked Jane Doe to send him a copy of Newton's script, "The Will to Resist"—Newton's "prestige epic project" "about the triumph of women over tyranny."  *Id.* ¶ 20; *accord id.* ¶¶ 8, 43.  Meyer then called Jane Doe to voice his enthusiasm, expressing that "[t]he script is wonderful," "everyone will want to be in this movie," and "this film will get made."  *Id.* ¶ 20.  Meyer also offered to lend his support to Newton, saying "if anyone wants my opinion on the script have them call me."  *Id.*  Meyer eventually invited

---

[1] The following facts are taken from the Third Amended Complaint, Dkt. 36 ("Third Am. Compl."), and are assumed as true for the purposes of this Opinion and Order.  *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"); *Matthew v. Tex. Comptroller of Pub. Accts.*, No. 21 Civ. 5337 (JPC), 2022 WL 4626511, at *1 n.1 (S.D.N.Y. Sept. 30, 2022) (same).

[2] While NBCU contends, and Newton does not dispute, that Jane Doe was Newton's "girlfriend" during the events giving rise to Newton's claims, Dkt. 45 ("NBCU Motion") at 3, the Third Amended Complaint does not contain any allegations describing the exact nature of, or affixing any labels to, Newton and Jane Doe's relationship.

Newton to a meeting at his office at Universal Studios in California, which occurred on February 2, 2017. *Id.* ¶ 21; *see id.* ¶ 18 (alleging that Meyer's office at Universal Studios was in California). At the meeting, Meyer "repeated his praise for Newton's 'The Will to Resist' script and offered his help to get it produced." *Id.* ¶ 21. Meyer also offered to read Newton's other script for "Nicole & O.J."[3] and "invited Newton to contact him directly if he ever needed help or advice on any of his projects." *Id.*

Based on this February 2, 2017 meeting, Newton alleges that he "reasonably believed that Meyer was offering to act as Newton's talent agent," presumably forming the basis of a fiduciary relationship. *Id.* ¶ 22; *accord id.* ¶¶ 8, 9, 84 (alleging that Meyer and NBCU were fiduciaries to Newton because, among other reasons, Meyer "agreed to represent Plaintiff as his actual or de facto talent agent to obtain financing and distribution of Newton's films, 'Nicole & O.J[.]' and 'The Will to Resist'"). Newton also believed that Meyer "was a very powerful figure in the industry" and would benefit from this arrangement by further "expansion and cultivation of his vast global network of entertainment industry contacts." *Id.* ¶ 22. Thus, "Newton quite willingly agreed to put his career and future in the film industry in Meyer's more than capable hands," with Meyer having "effective control over Newton's film efforts." *Id.*

About a week after their Universal Studios meeting, Meyer called Newton to praise both scripts, but emphasized that he would not recommend "The Will to Resist" "for production at Universal if Jane Doe was cast in a leading role." *Id.* ¶ 29. Meyer offered to recommend the script for "The Will to Resist" to various renowned producers outside of NBCU, however. *Id.* ¶ 30.

---

[3] While not explicitly confirmed in the Third Amended Complaint, this film appears to be about the relationship between Orenthal James ("O.J.") Simpson and his wife, Nicole Brown Simpson, and her and Ron Goldman's subsequent murders. *See* Third Am. Compl. ¶¶ 2, 42, 75; *see generally, e.g.*, O.J.: Made in America (ESPN 2016).

Newton alleges that the actual reason Meyer sought to keep any film starring Jane Doe away from his studio was his "desire to keep Jane Doe and his abusive 'me-too' relationship with her at a safe distance from Meyer's own career at NBCUniversal." *Id.* ¶ 29.  Then, in July 2017, Meyer forwarded the script for "Nicole & O.J." to a group of film producers led by Brett Ratner (the "Ratner Group").  *Id.* ¶ 34; *accord id.* ¶ 31 (alleging the makeup of the Ratner Group).  Newton alleges that Meyer sent the script to the Ratner Group not to help Newton, but rather to "keep Jane Doe under control," since she was attached to star in "Nicole & O.J."  *Id.* ¶ 34.  Indeed, according to Newton, members of the Ratner Group also had engaged in "abusive 'me-too' relationships" with Jane Doe.  *Id.* ¶ 27.  Later that month, Meyer told Newton that Ratner praised the "Nicole & O.J." script and that another member of the Ratner Group, Jamie Packer, "wished to finance" the film.  *Id.* ¶ 35.  Meyer further informed Newton that a role in the movie could be offered to Jane Doe.  *Id.*  In early August 2017, Meyer set up a meeting between Newton and Ratner at the Beverly Hills Hotel in California to finalize the deal.  *Id.* ¶ 37.  Again, Newton alleges that Meyer's motivation in arranging this meeting was "his desire to protect the Ratner Group and himself," as Jane Doe was preparing to file a lawsuit against members of the Ratner Group.  *Id.*

The meeting at the Beverly Hills Hotel occurred on or about August 7, 2017, and was attended by Ratner, Newton, and Jane Doe.  *Id.* ¶ 38.  Rather than discussing Packer fully financing the film, however, Ratner "proposed . . . a plan that would purportedly enable the full financing of the film based on the value of attaching Ratner's name as a producer of the film."  *Id.* (emphasis omitted).  Specifically, Ratner offered an initial investment of $1 million to "shoot a few scenes" and to attach his name as a producer thereby adding standing to the project.  *Id.*  Newton was dismayed, as he was under the impression that Ratner would be offering "full financing" from Packer based on his prior conversation with Meyer.  *Id.*  At Meyer's encouragement, however,

Newton took the deal.  *See* ¶¶ 38 (alleging that Meyer "emphasized that Ratner's offer, if accepted, would ensure that the film would get made, by giving it significant value and credibility"), 39 ("In reasonable reliance on Meyer's advice and persuasiveness, Newton agreed to accept Ratner's offer.").[4]

In a subsequent phone call with Newton's business partner on September 4, 2017, Meyer repeated his praise for Newton's script, saying "I always thought [O.J.] was guilty until I read [Newton's] script"; "I've come to know [Newton] really well and believe in him a hundred percent"; and "I think [Newton] has a vision that's quite brilliant."  *Id.* ¶ 2; *accord id.* ¶ 42.  Meyer also reiterated to Newton's partner his support for the film, saying "Let's make this movie before this guy gets out of prison"; "We'll find ways to get this movie financed and distributed"; "I want my company to see it"; and "[f]orgive me if I sound more like [Ratner's] agent I'm absolutely not, I'm much more on [Newton's] side, I know [Newton] knows that."  *Id.* ¶ 2.  Newton alleges these statements "led [him] to believe . . . that [Ratner's offer] would get Newton's 'O.J. film' made and distributed."  *Id.* ¶ 39.

After Newton finalized the agreement and received initial funds, *id.* ¶ 46, he shot and post-produced the first fifteen minutes of "Nicole & O.J.," with those scenes completed by September 2018, *id.* ¶¶ 51, 56-57.  Meyer continued to encourage Newton and provide support.  For example,

---

[4] Newton alleges that his deal with Ratner was subsequently revised as "part of Jane Doe's Settlement Agreement during a mediation on August 9, 2017 that Newton had agreed to attend as merely a support person for Jane Doe."  Third Am. Compl. ¶ 40.  Specifically, "[a]t the mediation, the participants . . . pressured Newton to agree to incorporate into Jane Doe's Settlement Agreement an obligation to enter into a separate film financing agreement on terms that were considerably less favorable than what Ratner had offered" Newton at the August 7, 2017 meeting.  *Id.*  Newton maintains that the purpose of this revised arrangement was to give him "just enough to keep him 'on the line' and thinking that [Meyer and the members of the Ratner Group were] going to get his O.J film produced and distributed so that in turn they could continue to use Newton and his O.J. film as bait to keep Jane Doe on the line as well."  *Id.*  However, the Third Amended Complaint lacks any detail as to the terms of this revised deal.

in early May 2018, "Meyer advised Newton to publicize 'Nicole & O.J.' at the Cannes Film Festival," and he recommended Newton to the "Chairman of [an] industry-renowned" publicity firm, which resulted in "Nicole & O.J." being publicized on *People* magazine's website. *Id.* ¶ 53. Meyer also invited Newton to screen the segment of "Nicole & O.J" at the Executive Screening Room at Universal Studios. *Id.* ¶ 58. During that screening, which occurred on or about January 24, 2019, "Meyer congratulated Newton," called Newton "'the new Stanley Kubrick,'" and predicted that "this will make money." *Id.* ¶ 59. Finally, Meyer recommended "Nicole & O.J." to Jason Blum—the head of Blumhouse Productions, "a leading producer of motion pictures." *Id.* ¶ 70. Because of Meyer's recommendation, on or about March 6, 2019, Newton screened his material for Blum, who "appeared impressed." *Id.* ¶ 71.

Unfortunately for Newton, his prospects began to change for the worse when Jane Doe's relationships with the Ratner Group and Meyer became public. *Id.* ¶¶ 48, 60. In March 2019, Blum and two other production companies who had expressed interest in "Nicole & O.J." pulled their support for the film. *Id.* ¶¶ 72-73. About a month later, the actor who was set to star as O.J. Simpson pulled out, telling Newton, "you have lost your reputation.'" *Id.* ¶ 75. Despite these negative reactions, Meyer continued to support Newton, and agreed to call another executive at a distribution company, with whom Newton had met at Cannes. *Id.* ¶ 76; *see id.* ¶ 53 (alleging that "Meyer advised Newton to publicize 'Nicole & O.J.' at the Cannes Film Festival"). While the executive agreed to watch the fifteen-minute opening of "Nicole & O.J.", he too ultimately declined to support the film. *Id.* ¶ 77. Eventually, Meyer admitted to Newton that the situation had become "dire," yet Meyer continued to offer his assistance. *Id.* ¶ 78. Meyer instructed Newton to "keep him updated" and called Newton "many times" to check in, even while travelling abroad.

*See id.* (noting that Meyer called multiple times "[f]rom an aircraft . . . from Europe, and once from Beijing").

Meyer and Newton's relationship eventually broke down after Jane Doe formally sued Meyer and members of the Ratner Group. *Id.* ¶ 79. Meyer called Newton to complain about the suit, before launching into a disgraceful rant about Jane Doe that entailed extremely offensive insults about her, thereby revealing their prior relationship. *Id.*[5] This "shocked Newton" but made him "realize that Meyer's abusive sexual relationship had put Meyer in a conflict of interest; his efforts to save his own skin and his related efforts to save the skins of members of the Ratner Group conflicted with his [alleged] fiduciary duties owed to Newton as Newton's talent agent." *Id.* ¶ 81. Newton subsequently had trouble reaching Meyer, with Meyer's assistant telling him in early November 2019 "that Meyer had been instructed by his counsel not to communicate with Newton." *Id.* ¶ 80. Undeterred, Newton continued to reach out to Meyer and eventually was able to connect with him while Meyer was staying at the Mandarin Oriental Hotel in New York City. *Id.*; *see also id.* (alleging that Newton called the hotel and "ask[ed] to be put through to 'Ron Meyer's suite'"). During this call, Meyer told Newton that "his counsel had told him not to speak with Newton" pending mediation "because Newton had told Jane Doe about Meyer's" disgraceful rant. *Id.* Still, Meyer promised to "sit down and have a coffee" with Newton once that litigation was resolved. *Id.*

Meyer was terminated as Vice Chairman at NBCU in August 2020. *Id.* ¶ 26. This suit followed.

---

[5] The Court declines to recite the language allegedly used by Meyer during this rant, but his words are alleged at paragraph 79 of the Third Amended Complaint.

B.      **Procedural History**

Newton initiated this action against Meyer and NBCU on January 20, 2022.  *See* Dkt. 1.

On January 26, 2022, the Honorable Analisa Torres, to whom this case was originally assigned,

ordered Newton to amend his Complaint, as Newton had failed to properly allege diversity

jurisdiction.  Dkt. 11.  Newton filed an Amended Complaint on February 14, 2022, Dkt. 13, and a

Second Amended Complaint on February 23, 2022, Dkt. 14.  On May 5, 2022, Newton sought

leave to file a Third Amended Complaint in response to letters from Defendants outlining various

purported deficiencies in the Second Amended Complaint.  Dkt. 30.[6]  In particular, Newton

represented to the Court that his amendment would "address[] all the issues raised by the NBCU

letter (and thus most of the Meyer letter) and  . . . will make sure that facts are pleaded supporting

personal jurisdiction over Meyer."  *Id.* at 2.  Judge Torres granted Newton leave to file the Third

Amended Complaint, Dkt. 33, which he did on May 27, 2022.

As noted above, the Third Amended Complaint contains three causes of action.  First,

Newton alleges that Meyer and NBCU breached fiduciary duties owed to him.  Third Am. Compl.

¶¶ 83-90.  Meyer alleges that NBCU and Meyer were "fiduciaries to Newton by virtue of . . . [the

fact] that Meyer, acting in the course and scope of his actual or apparent authority on behalf of

NBCU[] as its Vice Chairman, agreed to represent Plaintiff as his actual or de facto talent agent."

---

[6] In his letter seeking leave to amend, Newton explained that, pursuant to Judge Torres's individual rules, the parties exchanged letters discussing alleged pleading deficiencies identified by Defendants.  Dkt. 30.  NBCU raised with Newton, *inter alia*, arguments that his allegations did not support an inference of its liability and that he failed to state a claim for breach of fiduciary duty, fraudulent inducement, and negligent misrepresentation.  *Id.* at 2.  Meyer also appeared to raise similar arguments challenging whether a claim had been stated for those three causes of action.  *Id.*  Furthermore, Meyer argued "that there was a failure to allege what was necessary to establish personal jurisdiction over Meyer, saying what was alleged was conclusory and denying it was alleged that Newton's claims arose out of Meyer's activities in New York," yet Newton expressed his disagreement with Meyer on this point.  *Id.*

*Id.* ¶ 84.  Newton alleges breach of that duty in that Meyer failed to disclose his "conflict of interest motivated by his selfish interest in protecting his own career and financial interests by keeping secret his abusive sexual relationship with Joe Doe," *id.* ¶ 86, including also covering up conduct of members of the Ratner Group, *id.* ¶ 87, at the expense of "Newton's films and career[] in the film industry," *id.* ¶ 86.  The result, Newton alleges, has been "severe irreparable damage to Newton's films," rendering it "currently impossible for Newton to obtain financing, production, or distribution for them," *id.* ¶ 88, and causing Newton to "sustain[] tremendous damages," *id.* ¶ 89.  Second, Newton brings a claim for fraudulent inducement based on Meyer's false "promise[] . . . that he would ensure that Newton's films . . . would be made, using his influence as a reputable super-agent and a powerful studio executive to arrange financing, production, and distribution of the films." *Id.* ¶ 92; *accord id.* ¶¶ 93-95.  As a result of that fraudulent inducement, Newton alleges that his "film projects are now impossible to finance and produce," *id.* ¶ 96, his "past and future earning potential has been severely damaged," *id.*, and he "sustained tremendous damages," *id.* ¶ 97.  Third, Newton brings a claim for negligent misrepresentation "in the alternative to" and based on a similar theory as his fraudulent inducement claim. *Id.* ¶¶ 99-103.

On June 10 and 17, 2022, Defendants sought leave to move to dismiss.  Dkts. 38-39.  Judge Torres granted their requests.  Dkt. 43.  On July 26, 2022, Defendants separately moved to dismiss.  Dkts. 44-46, 47 ("Meyer Motion").  Newton filed separate briefs in opposition to the motions on September 2, 2022, Dkts. 50 ("Opposition to NBCU MTD"), 51 ("Opposition to Meyer MTD"), and Defendants replied on September 16, 2022, Dkts. 53 ("NBCU Reply"), 54 ("Meyer Reply").  The case was transferred to the undersigned on November 9, 2022.  *See* Nov. 9, 2022 Notice of Case Reassignment.

## II.  Legal Standard

### A.     Motion to Dismiss for Lack of Personal Jurisdiction

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists."  *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010) (internal quotation marks omitted).  A plaintiff bears the burden of raising facts that, "if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant."  *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (internal quotation marks and brackets omitted); *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).  Although all allegations are "construed in the light most favorable to the plaintiff," *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993), a court need not "draw argumentative inferences in the plaintiff's favor" or "accept as true a legal conclusion couched as a factual allegation," *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 673 (citations and internal quotation marks omitted).  *See also Al Thani v. Hanke*, No. 20 Civ. 4765 (JPC), 2021 WL 1895033, at *4 (S.D.N.Y. May 11, 2021).

### B.     Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although a court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v.*

*Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2019).  *See also Paul Hobbs Imports Inc. v. Verity Wines LLC*, No. 21 Civ. 10597 (JPC), 2023 WL 374120, at *3 (S.D.N.Y. Jan. 24, 2023).

Where, as here, there are claims sounding in fraud, a complaint must meet the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure.  "Rule 9(b) requires that 'a party must state with particularity the circumstances constituting fraud or mistake,' although '[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally.'" *Valentini v. Grp. Health Inc.*, No. 20 Civ. 9526 (JPC), 2021 WL 6113991, at *3 (S.D.N.Y. Dec. 27, 2021) (alteration in original) (quoting Fed. R. Civ. P. 9(b)), *aff'd*, No. 22-157, 2023 WL 2027273 (2d Cir. Feb. 16, 2023).  In other words, Rule 9(b) requires pleading the circumstances of the fraud and the defendant's mental state. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015).  To satisfy this heightened burden, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Id.* (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)).  In terms of a defendant's mental state, the complaint must allege facts "that give rise to a strong inference of fraudulent intent." *Id.* (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)).  "Courts view the alleged facts 'in their totality, not in isolation." *Valentini*, 2021 WL 6113991, at *3 (quoting *Loreley*, 797 F.3d at 171).

### III.   Discussion

#### A.      Personal Jurisdiction

The Court begins with Meyer's motion to dismiss for lack of personal jurisdiction.  *See Brownstone Inv. Grp. LLC v. Bonner & Partners, LLC*, No. 20 Civ. 7351 (AJN), 2021 WL 3423253, at *2 (S.DN.Y. Aug. 5, 2021) ("Whether there is personal jurisdiction is a 'threshold matter' that should usually precede determination of the merits." (quoting *In re Rationis Enters., Inc. of Panama*, 261 F.3d 264, 267-68 (2d Cir. 2001))).   Assessing this Court's personal jurisdiction over Meyer entails a two-step process.   First, the Court must establish that there is a "statutory basis for exercising personal jurisdiction."  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 128 (2d Cir. 2013).   In evaluating this requirement, a court sitting in diversity looks to "the law of the forum in which the court sits"—here, New York.  *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986); *see also Al Thani*, 2021 WL 1895033, at *5.   Second, the court must determine whether the exercise of personal jurisdiction comports with due process.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985); *Chloé*, 616 F.3d at 164.

Under New York's long-arm statute, a court may exercise personal jurisdiction over any non-domiciliary who "in person or through an agent" (1) "transacts any business within the state or contracts anywhere to supply goods or services in the state," N.Y. C.P.L.R. § 302(a)(1); (2) "commits a tortious act within the state," *id.* § 302(a)(2); (3) commits a tortious act [outside] the state causing injury to person or property within the state," *id.* § 302(a)(3); or (4) "owns, uses, or possesses any real property situated within the state," *id.* § 302(a)(4).   The Court addresses each basis in turn.

#### 1.       Business Transactions

New York's long-arm statute allows a court to exercise personal jurisdiction over a defendant who "in person or through an agent . . . transacts any business within the state or

contracts anywhere to supply goods or services in the state'" but only if "the claim asserted . . . arise[s] from that business activity." *Assaf v. Port Auth. of N.Y. & N.J.*, No. 20 Civ. 9460 (JPC), 2021 WL 2418243, at *3 (S.D.N.Y. June 14, 2021) (quoting N.Y. C.P.L.R. § 302(a)(1) and then *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013)). "[P]roof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enter[ed] New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988).

Newton alleges that while Meyer was, at all relevant times, a resident of California, his position as Vice Chairman of NBCU, which is headquartered in this District, meant that Meyer was required to "maintain[] an office in New York City."[7]  Third Am. Compl. ¶ 18; *accord id.* ¶¶ 14-15.  Newton further alleges that Meyer "would shuttle between his office at Universal Studios in California and Defendant NBCU[]'s headquarters in New York City" and that he "had a suite at the Mandarin Oriental."  *Id.* ¶ 18.

Even if these allegations were sufficiently specific to demonstrate that Meyer "transacts business" within New York, Newton fails to allege that any of his claims arise out of Meyer's business transactions within the state.  Rather, the relevant "business transactions" involving Meyer that are alleged in the Third Amended Complaint and relevant to Newton's claims occurred in California.  Most notably, Meyer's agreement to assist Newton with his films—the alleged basis of Newton's fiduciary relationship with Meyer, *id.* ¶ 84—was formed in California.  Newton's

---

[7] Although the Court must accept as true the factual allegations in the Third Amended Complaint, the Court notes that according to Meyer's counsel in the brief in support of his motion to dismiss, "Mr. Meyer . . . did not have a dedicated office in New York."  Meyer Motion at 21 n.13.

original meeting with Meyer, when Meyer allegedly offered to serve as Newton's de facto talent agent, occurred at Meyer's office at Universal Studios in California. *See id.* ¶¶ 20-23. Newton's subsequent meeting with Ratner—at Meyer's behest—at which they discussed the revised offer for partial financing of "Nicole & O.J.", also occurred in California at the Beverly Hills Hotel. *Id.* ¶ 38. These allegations serve as the primary basis for Meyer's breach of fiduciary duty, particularly since Newton alleges that Meyer schemed with Ratner to make that revised offer and encouraged Newton to accept it out of self-interest. *Id.* ¶¶ 38-39.[8]

Accordingly, Newton fails to allege a sufficient "articulable nexus between the business transacted and the cause of action sued upon" to establish personal jurisdiction under section 302(a)(1). *Al Thani*, 2021 WL 1895033, at *7 (quoting *McGowan v. Smith*, 419 N.E.2d 321, 323 (N.Y. 1981)).

### 2.    Use of Real Property

Newton also asserts that Meyer "used real property within the meaning of" section 302(a)(4). Opposition to Meyer MTD at 24. That subsection allows for personal jurisdiction over a defendant who "owns, uses or possesses any real property situated within the state," N.Y. C.P.L.R. § 302(a)(4), but only if "the plaintiff's 'cause of action . . . arise[s] out of the fact of ownership, use or possession of New York realty," *Elsevier, Inc., v. Grossman*, 77 F. Supp. 3d 331, 346 (S.D.N.Y. 2015) (internal brackets omitted) (quoting *Tebedo v. Nye*, 256 N.Y.S.2d 235,

---

[8] While Newton alleges that this deal was subsequently revised at a mediation session between Jane Doe and members of the Ratner Group, he does not allege that Meyer attended that mediation, or that the mediation occurred in New York. *See* Third Am. Compl. ¶ 40. The same is true of the meetings, which Meyer either arranged or encouraged, between Newton and the "industry-renowned" publicity firm, Jason Blum, and other executives of production and distribution companies. *See id.* ¶¶ 53, 70-73, 76-78. Even if these meetings qualified as "business transactions," Newton does not allege that Meyer attended them or that they occurred in New York. *Id.*

236 (N.Y. Sup. Ct. 1965)).  Indeed, "'it is not enough for the property to be related in some way to the parties' dispute."  *Lear v. Royal Caribbean Cruises, Ltd.*, No. 20 Civ. 4660 (GHW), 2021 WL 1299489, at *11 (S.D.N.Y. Apr. 7, 2021) (quoting *Elsevier*, 77 F. Supp. 3d at 346).  Rather, section 302(a)(4) "requires a relationship between the property and the cause of action sued upon." *Lancaster v. Colonial Motor Freight Line, Inc.*, 581 N.Y.S.2d 283, 288 (App. Div. 1992).

The Third Amended Complaint contains two allegations regarding real property in New York: first, that Meyer was required to maintain an office at NBCU's headquarters at 30 Rockefeller Plaza in Manhattan, Third Am. Compl. ¶¶ 15, 18; and second, that Meyer took a call from Newton while at his Mandarin Oriental suite in New York City, *id.* ¶¶ 18, 80.  But these allegations, even accepting them as true, would not provide a basis for personal jurisdiction under section 302(a)(4) because none of the alleged misstatements or the alleged fiduciary relationship concerns NBCU's corporate headquarters or Meyer's Mandarin Oriental suite.  *See Elsevier*, 77 F. Supp. 3d at 346 ("Critically, the causes of action in this case, which concern an allegedly fraudulent scheme, do not derive from—and thus can be maintained irrespective of—[defendant's] ownership, possession, or use of the apartment in New York. . . .  [The defendant's] ownership and use of property in New York . . . is not a fact sufficient to confer jurisdiction upon the Court under § 302(a)(4).").  Thus, Newton has failed to allege personal jurisdiction under section 302(a)(4) as well.

### 3.    Tortious Acts Causing Injury in New York

Newton does not contend that section 302(a)(3) is applicable here.  *See* Opposition to Meyer MTD at 24.  And it plainly is not.  That subsection permits the Court to exercise personal jurisdiction over a defendant who or whose agent "commits a tortious act [outside] the state causing injury to person or property within the state."  N.Y. C.P.L.R. § 302(a)(3).  Newton is a citizen and domiciliary of the United Kingdom, Third Am. Compl. ¶¶ 13, 16, and does not make

any allegations that he was physically present in New York, let alone injured by Meyer's allegedly tortious conduct while in New York.  Accordingly, section 302(a)(3) does not provide a basis for the Court to exercise personal jurisdiction over Meyer.

### 4.     Tortious Acts Committed in New York

Finally, New York also allows for personal jurisdiction if a defendant "in person or through an agent . . . commits a tortious act within the state."  N.Y. C.P.L.R. § 302(a)(2).  This subsection, however, "reaches only tortious acts performed by a defendant who was *physically present* in New York when he performed the wrongful act," *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 28 (2d Cir. 1997) (emphasis added), and so "a defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)," *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999).

Here, Newton alleges that Meyer committed the torts of breach of fiduciary duty, fraudulent inducement, and negligent misrepresentation by agreeing to serve as Newton's actual or de facto talent agent yet having an undisclosed conflict of interest, making numerous false or misleading statements in praise of Newton's two films, and promising to help get those films made. *See, e.g.*, Third Am. Compl. ¶¶ 84-87, 92-95, 100.  But the Third Amended Complaint lacks clarity as to which, if any, of these statements were made while Meyer was physically present in New York.

Newton broadly alleges that from the "mass of telephone calls between Defendant Meyer and Newton during the period February 2017 and November 2019, many took place whilst Defendant Meyer was in New York on business, with Newton often calling the Mandarin Oriental,

asking for 'Ron Meyer's suite' and being put through without hesitation." *Id.* ¶ 18.[9]  But while Newton identifies many of his phone calls with Meyer by date, with one exception, he fails to also allege that Meyer was in New York when the calls were made.  And the one call between Newton and Meyer that did allegedly occur while Meyer in New York—the November 2019 call that Meyer took while in his suite at the Mandarin Oriental—merely entailed a brief conversation during which Meyer said he was told not to speak with Newton because of Jane Doe's pending mediation and their prior conversation during which Meyer maligned her. *Id.* ¶ 80.  Significantly, this November 2019 call did not relate to Meyer's alleged de facto representation of Newton or involve any allegedly false or misleading statements. *Id.*

That said, Newton also alleges that "*[a]ll* telephone calls made by Meyer to Newton were patched through by NBCUniversal employees who worked as Meyer's assistants, made from either Meyer's NBCUniversal office, or while travelling on NBCUniversal business." *Id.* ¶ 8 (emphasis added).  This language could be read to allege that every time Meyer called Newton, one of Meyer's assistances, located in NBCU's office, connected the call to Newton.  Similarly, Newton alleges that Meyer did not give Newton his cellphone number, and instead told Newton "that the best way to reach [Meyer] was through Meyer's NBCUniversal office or by email to Meyer's NBCUniversal email address, which Meyer stated one of his assistances 'would pick up.'" *Id.*[10]  But the Third Amended Complaint is unclear whether those assistants were in NBCU's office

---

[9] It appears that this language was added to the Third Amended Complaint to address the concern Meyer previously raised to Newton that the Second Amended Complaint failed to sufficiently allege personal jurisdiction over him. *Compare* Third Am. Compl. ¶ 18, *with* Dkt. 30 ¶ 18; *see* Dkt. 30 at 2.

[10] As to calls made by Newton to Meyer, the Third Amended Complaint specifically alleges that one did not involve Meyer's assistant connecting the participants.  The November 2019 conversation allegedly resulted from Newton calling the Mandarin Oriental hotel in Manhattan and asking to be put through to Meyer's suite.  Third Am. Compl. ¶ 80.  But as noted, that call did

in California, in its office in New York, or elsewhere.[11]  As noted, Newton does allege, however, that Meyer maintained an office in New York.  *Id.* ¶ 18.  Further, neither party has briefed whether the act of Meyer's assistant connecting Newton and Meyer for a relevant call would be sufficient to establish personal jurisdiction over Meyer pursuant to section 302(a)(2) if that assistant were located in New York.  The Court is therefore unable to conclude on the current record whether section 302(a)(2) provides a basis to exercise personal jurisdiction over Meyer.

Ordinarily when allegations in a complaint suggest the possibility that personal jurisdiction may exist, but more facts are needed to make that determination, the Court would order jurisdictional discovery.  *See Leon v. Shmukler*, 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014) ("It is well settled under Second Circuit law that, even where plaintiff has not made a prima facie showing

---

[11] not give rise to any of the claims in this case.  Newton generally alleges that other calls also occurred in this manner, but fails specify which ones. *See id.* ¶ 18 (alleging that "many [calls between February 2017 and November 2019 between Meyer and Newton] took place whilst Defendant Meyer was in New York on business, with Newton often calling the Mandarin Oriental, asking for 'Ron Meyer's suite' and being put through").

[11] While the paragraph of the Third Amended Complaint alleging personal jurisdiction over Meyer appears to distinguish NBCU's offices in California and New York by referring to the California location as "Universal Studios" and the New York location as "NBCUniversal," Third Am. Compl. ¶ 18 ("Throughout his Vice-Chairmanship, Defendant Meyer would shuttle between his office at Universal Studios in California and Defendant NBCUniversal's headquarters in New York City."), for the most part, the Third Amended Complaint uses these or similar names interchangeably, *see, e.g.*, *id.* ¶¶ 8 (alleging that Newton attended a meeting at "Meyer's office at Universal Studios" but "was issued an NBCUniversal pass to the studio"), 29 (alleging that Meyer refused to recommend Newton's films "for production at *Universal* if Jane Doe was cast in a leading role," and that his "unwillingness to make 'The Will to Resist' at *Universal* was [purportedly] due to Jane Doe's lack of credits" but that in truth Meyer "desire[d] to keep Jane Doe and his abusive 'me-to' relationship with her at a safe distance from Meyer's own career at *NBCUniversal*" (emphases added)), 43 ("Meyer recommended that Newton accept this materially different and inferior deal to enable to the production of 'The Will to Resist' through *Universal Pictures*.  Meyer represented to Newton that attaching Ratner's name to 'The Will to Resist' would attract stars, making the film viable for *NBCUniversal*." (emphases added)), 59 (alleging that "Newton screened the material for Meyer *at Universal Studios*" but that Meyer "did not show it to anyone [else] at *NBCUniversal*" and that "Meyer also advised Newton that *Universal* could make" his films down the line (emphases added)).

18

of personal jurisdiction, a court may still order discovery, in its discretion, when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record."); *see also APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) ("[A] court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction . . . ." (internal quotation marks omitted)).  Indeed, jurisdictional discovery would be particularly appropriate in this case given that a person in Newton's position who received a phone call typically would not know the exact location of a caller without asking, *cf. Al Thani*, 2021 WL 1895033, at *14 (ordering jurisdictional discovery "[b]ecause [the plaintiff] dealt entirely with [one of the defendants], [and so,] it is not surprising that he would not know the inner-workings of the [defendants'] conspiracy and the relationships between the co-conspirators"), and in light of Meyer's counsel's unsworn assertion that contrary to the allegations in the Third Amended Complaint, Meyer "did not have a dedicated office in New York," Meyer Motion at 21 n.13.  However, because Newton also fails to state a claim against Meyer, *see infra* III.B, jurisdictional discovery would be futile.[12]  Accordingly, the Court denies Meyer's motion to dismiss for lack of personal jurisdiction without prejudice as moot.

---

[12] Ordinarily, the Court would not reach the merits of Newton's claims against Meyer until first confirming that personal jurisdiction over him exists.  However, the Second Circuit has noted that the "practice" of "treat[ing] personal jurisdiction as a threshold question to be addressed prior to consideration of the merits of a claim . . . is prudential and does not reflect a restriction on the power of the courts to address legal issues." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013).  Thus, for instance, "[i]n cases involving 'multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action,' [a district court may] proceed[] directly to the merits on a motion to dismiss."  *Id.* (quoting *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012))).  Moreover, Newton's claims against NBCU are premised entirely on a theory of vicarious liability arising from Meyer's alleged misconduct, and so the Court must address the merits of Newton's claims against Meyer in order to decide NBCU's motion to dismiss.

**B.**      **Failure to State a Claim**

Turning to the merits, Newton alleges breach of fiduciary duty, fraudulent inducement, and negligent misrepresentation against both Defendants.  Yet the Third Amended Complaint is devoid of any allegations of specific misconduct by NBCU.  *See* NBCU Motion at 6.  Rather, Newton appears to be asserting that NBCU should be vicariously liable for Meyer's actions on the theory of respondeat superior.  Opposition to NBCU MTD at 13 ("The [Third Amended Complaint], however, pleads facts properly establishing that Meyer's acts may be *imputed* to NBCU." (emphasis added)); *accord Riviello v. Waldron*, 391 N.E.2d 1278, 1280-81 (N.Y. 1979) ("[T]he doctrine of [r]espondeat superior renders a master vicariously liable for a tort committed by his servant while acting within the scope of his employment . . . .").  Because, as discussed below, Newton "has failed to plead any viable claim" against Meyer, his "respondeat superior claim against [NBCU] is dismissed as well."  *See Udechukwu v. City of New York*, 333 F. Supp. 3d 161, 172 (E.D.N.Y. 2018); *see also Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 546 (N.Y. 1980) ("We have already determined that none of the four Newsday employees who were named as defendants in the instant action may be cast in damages for libel . . . .  It follows that the suit against Newsday cannot be maintained solely on the theory that it is vicariously liable, since there is no primary liability upon which such a claim of vicarious liability might rest.").  The Court addresses each of Newton's claims in turn.

**1.      Breach of Fiduciary Duty**

"Under New York law,[13] a claim for breach of fiduciary duty requires a fiduciary relationship between the parties and a breach of that duty."  *Intellivision v. Microsoft Corp.*, 784

---

[13] Newton brings each of his three causes of action under New York law.  *See* Third Am. Compl. ¶¶ 84, 95, 100.  While NBCU does not dispute the applicability of New York law, Meyer notes that Newton "does not explain his contention as to why the application of New York law

F. Supp. 2d 356, 372 (S.D.N.Y. 2011), *aff'd*, 484 F. App'x 616 (2d Cir. 2012). "A fiduciary relationship 'exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'" *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19 (2005) (quoting Restatement (Second) of Torts § 874 cmt. a); *see also Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 289 (S.D.N.Y. 1995) ("Under New York law, a fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another."). Typical examples include the attorney/client relationship and the doctor/patient relationship. *Straudinger+Franke GMBH v. Casey*, No. 13 Civ. 6124 (JGK), 2015 WL 3561409, at *12 (S.D.N.Y. June 8, 2015). However, "[t]he existence of a fiduciary relationship cannot be determined by recourse to rigid formulas." *Thermal Imaging, Inc. v. Sandgrain Sec., Inc.*, 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001) (internal quotation marks omitted); *cf. Ne. Gen. Corp., v. Wellington Advert.*, 624 N.E.2d 129, 130 (N.Y. 1993) ("[A] fiduciary relationship does not arise by operation of law, but must spring from the parties themselves, who agree to and accept the responsibilities that flow from such a contractual fiduciary bond."). "Courts look to the parties' agreements to discover, not generate, the nexus of relationship and the particular contractual expression establishing the parties' interdependency." *Ne. Gen. Corp.*, 624 N.E.2d at 130.

Importantly, "[a] fiduciary relationship does not typically arise when parties engage in arms-length business transactions absent express language in a contract or a prolonged course of

---

might be appropriate, and it is by no means evident from the allegations in the [Third Amended Complaint]." Meyer Motion at 9 n.7. Ultimately, however, Meyer "assume[s], solely for purposes of this motion, that New York law applies to Plaintiff's claims." *Id.* The Court will therefore apply New York law, finding such consent sufficient to establish choice of law for the purposes of this motion. *See Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000).

dealings between the parties." *Al Thani*, 2021 WL 1895033, at \*18; *see also Saul v. Cahan*, 61 N.Y.S.3d 265, 268 (App. Div. 2017). Nor does "[m]ere reposal of one's trust or confidence in a party . . . automatically create a fiduciary relationship." *Thermal Imaging*, 158 F. Supp. 2d at 343. "Rather, a plaintiff must make a showing of special circumstances that could have transformed the parties' business relationship to a fiduciary one, such as control by one party of the other for the good of the other." *Saul*, 61 N.Y.S.2d at 268 (internal quotation marks omitted).

In this case, Newton acknowledges that no formal talent agreement existed between him and Meyer, Third Am. Compl. ¶ 9 ("Meyer and Newton did not sign a formal written talent agreement . . . ."), and he does not allege that one existed with NBCU. Rather, Newton alleges that "Meyer, acting in the course and scope of his actual or apparent authority on behalf of NBCUniversal as its Vice Chairman, agreed to represent Plaintiff as his actual or de facto talent agent to obtain financing and distribution of Newton's films." *Id.* ¶ 84. To the extent Newton suggests that this allegation, standing alone, is sufficient to plead a fiduciary relationship, *see* Opposition to Meyer MTD at 13; Opposition to NBCU MTD at 16, he is wrong. "[T]he Court is not required to credit legal conclusions that are dressed up as factual allegations that a defendant was in a fiduciary relationship with a plaintiff." *World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 504 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009); *see also* 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed.) ("[T]he court will not accept conclusory allegations concerning the legal effect of the events the plaintiff has set out if these allegations do not reasonably follow from the pleader's description of what happened, or if these allegations are contradicted by the description itself."). And even if Meyer could be considered Newton's talent agent, Newton does not cite any authority suggesting that a fiduciary relationship automatically arises between a talent agent and his or her client. Indeed, Courts have

suggested the opposite.  *Straudinger+Franke GMBH*, 2015 WL 3561409, at *12 ("The plaintiffs

also argue that the defendants owed a fiduciary duty to plaintiffs as their [talent] agent.  But . . .

more is required to establish a formal [fiduciary] relationship.").[14]  Newton must allege special

circumstances to show that Meyer's alleged agreement to represent Newton went beyond a normal

business relationship.  *See id.* (finding no fiduciary relationship between an artist and a talent agent

because "plaintiffs point to no such additional factors . . . to show that they had anything but a

conventional business relationship with defendants, albeit one governed by an oral agreement").

He has failed to do so.

While not dispositive, the Court finds persuasive that the Third Amended Complaint fails

to allege any of the classic hallmarks of a fiduciary relationship.  Newton does not allege that

Meyer had an explicit or implicit "power to bind" Newton, "power to negotiate" on behalf of

Newton, "power to affect any legal relations of" Newton, or "power to do anything except find

and introduce prospect[ive]" investors to Newton.  *Ne. Gen. Corp.*, 624 N.E.2d at 132.  Indeed,

while Meyer set up the August 7, 2017 meeting with Ratner at the Beverly Hills Hotel about

securing a possible investment in "Nicole & O.J.", *see* Third Am. Compl. ¶ 38 ("Newton met with

Ratner at the Beverly Hills Hotel, as instructed by Meyer."), Ratner made his offer to partially

finance the film directly to Newton at that meeting, *id.*, and there is no allegation that Meyer even

---

[14] Newton attempts to distinguish *Straudinger+Franke GMBH* and numerous other cases cited by Defendants as wholly inapplicable because they were decided on summary judgment rather than a motion to dismiss.  *See, e.g.*, Opposition to NBCU MTD at 16.  But the legal principles in *Straudinger+Franke GMBH* —*i.e.*, the requirements for forming a fiduciary relationship—are the same at the motion to dismiss stage as at summary judgment.

attended the meeting.[15]   This suggests that Meyer lacked the power to negotiate or agree to financing deals on Newton's behalf, as would a typical fiduciary.

Newton primarily points to the "importance of control to establishing a fiduciary relationship," and argues this element is satisfied based on allegations in the Third Amended Complaint that "Meyer had effective control of Newton's film efforts."   Third Am. Compl. ¶ 85; *accord* Opposition to Meyer MTD at 14-15; Opposition to NBCU MTD at 16-17.   This argument misses the mark for two reasons.   To start, there are no facts alleged in the Third Amended Complaint to back this up.   While the Third Amended Complaint alleges that Newton trusted Meyer and believed him to be an "entertainment industry kingpin[]" and a "super-agent" with "ultra-high standing and experience," Third Am. Compl. ¶¶ 22, 38, 92, no facts are alleged to suggest that Newton's trust in Meyer to act as his agent was reasonable.   *See Calvin Klein Trademark Tr. v. Wachner*, 123 F. Supp. 2d 731, 734 (S.D.N.Y. 2000) ("Nor can allegations of subjective intent substitute for an absence of objective manifestation of fiduciary obligation . . . .").   To the contrary, the Third Amended Complaint makes clear that at all relevant times, Meyer was the Vice Chairman of NBCU—not a talent agent.   Third Am. Compl. ¶¶ 1, 14 ("At all relevant times herein, Meyer was Vice Chairman and a managing agent[16] of Defendant NBCUniversal.").

---

[15] In fact, the Third Amended Complaint suggests the opposite.   *See* Third Am. Compl. ¶ 38 ("On or about August 7, 2017, Newton met with Ratner at the Beverly Hills Hotel, as instructed by Meyer.   *Jane Doe also attended the meeting.*" (emphasis added)); *see also id.* (alleging that while "Ratner's offer was a 'bait and switch' in relation to the proposed deal Meyer had originally described[,] . . . Meyer *subsequently* advised and persuaded Newton that Ratner's offer . . . would be of significant benefit to Newton" (emphasis added)).

[16] Newton's allegation that Meyer was a "managing agent" does not establish that he was a talent agent.   Newton does not explain what this title "managing agent" entails, and the Third Amended Complaint is clear that NBCU is an entertainment company that operates a movie studio, not a talent agency.   Third Am. Compl. ¶¶ 29 (alleging that Meyer declined to "recommend [Newton's films] for production at Universal"); 30 (similar, and alleging "on information and belief that [other producers] asked Meyer whether NBCUniversal would distribute Newton's

And even if there were sufficient facts alleged to plausibly suggest that Newton's trust in Meyer was reasonable, the Third Amended Complaint contains no allegations that Meyer dictated Newton's choices in any way.  Meyer, for example, did not force Newton to sign a deal with Ratner (let alone sign one on Newton's behalf)—he merely advised Newton that it would be wise to do so.

More importantly, while Newton insists that "[t]he pertinent control was Meyer over Newton's film efforts," Opposition to Meyer MTD at 14; *accord* Opposition to NBCU MTD at 17, this confuses the nature of a fiduciary relationship.  The "essential characteristic" of a fiduciary relationship is the principal's (here Newton's) control over the fiduciary (here Meyer)—not the other way around.  *In re Shulman Transp. Enter., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984) ("An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control."); *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 453-54 (S.D.N.Y. 2015) ("In order for a fiduciary relationship to arise, 'the principal must maintain control over key aspects of the undertaking.'" (quoting *Com. Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003))).  There are no allegations that Newton exercised any control whatsoever over Meyer in his undertakings as to Newton's films.  *See Straudinger+Franke GMBH*, 2015 WL 3561409, at *12 ("In this case, the plaintiffs have offered no evidence to show that they exercised control over MCA or any of the defendants.  In fact, in arguing that they put so much trust in the defendants that the plaintiffs were in the *defendants'* control, they suggest the

---

film"); 42 (noting that Meyer had "greenl[it] major films directed by Ratner during [his] long reign as President and COO of Universal Pictures" (internal quotation marks omitted)); 43 (alleging that Meyer encouraged Newton to accept Ratner's "inferior" deal for "Nicole & O.J." "to enable the production of 'The Will to Resist' through Universal Pictures"); 70 (noting other films distributed by NBCU); 71 ("Blum asked Newton whether Meyer was offering distribution by Universal.").

opposite.  Therefore, the 'essential element' of an agency relationship, control, is lacking in this case.").

Finally, Newton asks the Court to credit his belief that a fiduciary relationship existed between him and Meyer solely on the basis that he "is not a sophisticated Hollywood executive with knowledge of the industry even slightly close to Meyer's."  Opposition to Meyer MTD at 19; Opposition to NBCU MTD at 17.  Not only is this proposition flawed as a matter of law, *see Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v. Salomon Bros. Int'l Ltd.*, 674 N.Y.S.2d 648, 649 (App. Div. 1998) (holding that a "plaintiff's subjective claims of reliance on defendants' expertise" does not automatically give rise to a fiduciary relationship); *Thermal Imaging*, 158 F. Supp. 2d at 343 ("Mere reposal of one's trust or confidence in a party . . . does not automatically create a fiduciary relationship . . . ."), it is factually incorrect as well.  Newton alleges multiple times in his Third Amended Complaint that he is an "award-winning film director, producer, and screenwriter."  *E.g.*, Third Am. Compl. ¶ 13; *accord id.* ¶¶ 1, 24.  The notion that someone like Newton, with "award-winning" industry experience, would not understand the difference between formal representation by a talent agent and what more closely resembles a personal favor is utterly implausible.

Accordingly, because Newton has failed to allege the existence of a fiduciary relationship, he cannot state a claim for breach of fiduciary duty.  The first cause of action for breach of fiduciary duty is therefore dismissed.

### 2.  Fraudulent Inducement

There are four elements to fraudulent inducement under New York law: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damages as a result of such reliance."  *Spinelli v. Nat'l Football League*, 903 F.3d 185, 209 (2d Cir. 2018)

(quoting *Wall v. CSX Transp., Inc.*, 471 F.3d 140, 415-16 (2d Cir. 2006)); *accord Levy v. Maggiore*, 48 F. Supp. 3d 428, 462 (E.D.N.Y. 2014) ("A fraud in the inducement claim has the same elements as a fraud claim."); *Friar v. Wyndham Vacation Resorts, Inc.*, No. 20 Civ. 2627 (JPO), 2021 WL 1062615, at *4 (S.D.N.Y. Mar. 19, 2021) ("[T]he elements for fraud and fraudulent inducement are effectively the same.").

"A claim sounding in fraud must also meet the heightened standard set forth in Rule 9(b), which requires that the allegations 'state with particularity the circumstances constituting fraud.'" *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 585 (S.D.N.Y. 2021) (quoting Fed. R. Civ. P. 9(b)).  As noted above, that means the Third Amended Complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 352-53 (S.D.N.Y. 2020) (quoting *Eternity Glob. Master Fund*, 375 F.3d at 187).  This is commonly described as the "who, what, where, when, and why" of the claim.  *Chu v. Samsung Elecs. of Am., Inc.*, No. 18 Civ. 11742 (GHW), 2020 WL 1330662, at *5 (S.D.N.Y. Mar. 23, 2020).

First, Newton has failed to plead any materially false or misleading statements.  There are three general categories of statements allegedly made by Meyer that are identified with sufficient particularity:[17]

---

[17] Newton urges the Court to also credit Meyer's statement, alleged in paragraph 92 of the Third Amended Complaint, that he "promised to Newton that he would ensure that Newton's films . . . would be made, using his influence as a reputable super-agent and a powerful studio executive to arrange financing, production, and distribution of the films."  Opposition to NBCU MTD at 18; Opposition to Meyer MTD at 16.  But this is far too conclusory and fails the heightened pleading standard required by Rule 9(b).  There are no allegations of when such a statement was made or in what context.  *See Chu*, 2020 WL 1330662, at *5 (explaining that under Rule 9(b), a plaintiff must allege the "who, what, where, when, and why" of any alleged misstatement).  For a

1) Statements expressing a favorable opinion of Newton's scripts. *See, e.g.*, Third Am. Compl. ¶¶ 2 ("I always thought [O.J. Simpson] was guilty until I read [Newton]'s script"; "I've come to now know [Newton] really well and believe in him a hundred percent"; "I think [Newton] has a vision that's quite brilliant"), 20 ("The script is wonderful."), 59 (calling Newton "the new Stanley Kubrick").

2) Statements predicting Newton's films will be financially successful. *See, e.g.*, *id.* ¶¶ 3 ("There's no substitute for having a half hour of film or 15 minutes of a film and a script."), 4 ("I believe everyone will get their money back once [Newton] was able to start filming this movie."), 20 ("'[E]veryone will want to be in this movie,' and 'this film will get made.'"), 51 ("Can't wait to see your well-earned movie"), 59 ("this will make money").

3) Statements offering Newton assistance with getting his films made. *See, e.g.*, *id.* ¶¶ 2 ("Let's go sell it"; "Let's make this movie before this guy gets out of prison": "We'll find ways to get this movie financed and distributed"; "I want my company to see it"), 20 ("If anyone wants my opinion on the script have them call me"), 59 ("I want my company to see it"; telling Newton "that if anyone wanted Meyer's opinion, 'get them to call me'"), 76 (offering to call a distribution company executive to "tell him to do the movie").

---

similar reason, Newton cannot rely on the allegations in paragraph 23 of the Third Amended Complaint that Meyer made "statements praising Newton regarding his scripts," "express promises to get both films financed, made, and distributed globally," and "expert predictions that both films would achieve great critical commercial success." These allegations merely summarize and draw conclusions from the actual statements alleged in prior paragraphs and do not allege any additional statements with specifics as to when or in what context they were made.

These are not misstatements.  The statements in the first two categories "amount[] to little more than expressions of hope and opinion, and relate[] to future expectations, and hence cannot constitute actionable fraud."  *Int'l Fin. Corp. v. Carrera Holdings Inc.*, 920 N.Y.S.2d 310, 311 (App. Div. 2011); *see also N.Y. Fruit Auction Corp. v. City of New York*, 439 N.Y.S.2d 648, 652 (App. Div. 1981) ("It is the general rule that fraud cannot be predicated upon statements of representations which involve mere matters of futurity or things to happen or to be done in the future." (internal quotation marks omitted)).  This is especially true where, as here, there are no allegations that the opinion was not subjectively held—*i.e.*, Newton does not allege in the Third Amended Complaint that Meyer did not subjectively believe that the film scripts were "wonderful" or that Meyer thought that the scripts were objectively bad.  To the contrary, Newton alleges that "The Will to Resist" is a "prestige epic," and that Blum—"a leading producer of motion pictures"—"appeared impressed" by "Nicole and O.J." after viewing the first fifteen minutes. Third Am. Compl. ¶¶ 43, 70-72.  Nor were Meyer's statements offering to help inaccurate.  While Newton summarily alleges that "Meyer never made good on his promises to get the films 'off the ground,'" *id.* ¶ 95, he acknowledges that Meyer did, in fact, provide substantial assistance by, among other things, recommending Newton to an "industry-renowned" publicity firm, which resulted in "Nicole & O.J." being publicized on *People* magazine's website, *id.* ¶ 53; inviting Newton to screen "Nicole & O.J." at the Executive Screening Room at Universal Studios, *id.* ¶¶ 57-59; recommending the film to Blum who agreed to attend a private screening, *id.* ¶¶ 71-73; and calling a large distribution company executive—even after the news about Jane Doe became public, *id.* ¶¶ 75-77.

Second, Newton's mere allegation that he "did in fact reasonably rely on [Meyer's] promises" is insufficient to plead the third essential element.  *Id.* ¶ 93; *see also id.* ¶ 95 ("Under

New York law, Meyer engaged in promissory fraud and Newton reasonabl[y] relied on Meyer's promises . . . .").  The Third Amended Complaint must contain facts demonstrating such reliance was reasonable.  In this case, Newton "could not have reasonably relied on any misrepresentation or omission by [Meyer] as a matter of law."  *Spirit Partners, L.P. v. Audiohighway.com*, No. 99 Civ. 9020 (RJW), 2000 WL 1593385, at *9 (S.D.N.Y. Oct. 25, 2000).  "[I]f the plaintiff has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain he was induced to enter into the transaction by misrepresentations."  *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997); *see also Stuart Silver Assocs., Inc. v. Baco Dev. Corp.*, 665 N.Y.S.2d 415, 417 (App. Div. 1997) ("Where a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means, he cannot claim justifiable reliance on defendant's misrepresentations." (citation omitted)).  While Newton once again tries to plead ignorance, claiming that he "is not a sophisticated Hollywood executive with knowledge of the industry even slightly close to Meyer's," Opposition to Meyer MTD at 19, it does not take more than "ordinary intelligence" to know that Meyer's alleged promises that "this film will get made" were not guarantees—even from an "entertainment industry kingpin" like Meyer.  *See N.Y. Fruit Auction Corp.*, 439 N.Y.S.2d at 652 (noting that "great expectations often prove disappointing" without constituting "fraud").[18]  Nor does it take more than "ordinary intelligence" to understand that a person employed as Vice Chairman of a major film studio cannot also act as a personal agent.  And even if it did, surely an "award-winning" filmmaker such as Newton should reasonably understand that sometimes financing deals fall

---

[18] While Meyer was Vice Chairman of NBCU, Third Am. Compl. ¶ 14, there is no allegation that Meyer ever promised that NBCU itself would make Newton's films.  That would seem to be the most conceivable way that Meyer could have ensured the films would be made.

through and that an offer to do a personal favor is not the same as formal representation by a talent agent. *See Schlaifer Nance & Co.*, 119 F.3d at 98 ("The parties involved in this litigation are not widows or orphans. Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." (internal quotation marks omitted)); *Stuart Silver Assocs.*, 665 N.Y.S.2d at 418 (finding no justifiable reliance since "Plaintiffs were relatively sophisticated investors who should have understood the risks of investing in a real estate venture without conducting a 'due diligence' investigation or consulting their lawyers or accountants").

Accordingly, Newton's second cause of action alleging fraudulent inducement is dismissed.

### 3.  Negligent Misrepresentation

To sufficiently plead a claim for negligent misrepresentation, a plaintiff must allege that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012); *see also Colpitts*, 527 F. Supp. 3d at 587. Here, Newton's claim for negligent misrepresentation fails for the same reasons as his fraudulent inducement claim: he fails to allege that any of Meyer's statements were in fact false representations, and further he has not alleged facts to establish that his reliance on Meyer's statements was reasonable. *See Flemm v. Victory Com. Mgmt., Inc.*, No. 19 Civ. 11771 (JPC), 2021 WL 1565312, at *8 (S.D.N.Y. Apr. 21, 2021), *aff'd*, 2022 WL 774697 (2d Cir. Mar. 15, 2022).

Accordingly, Newton's negligent misrepresentation claim, his third cause of action, is dismissed.

## C. Leave to Amend

Having dismissed all of Newton's claims, the Court must consider whether to grant leave to amend.  Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires."  When deciding whether to grant leave to amend, "courts will consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility."  *Morales v. Kimberly-Clark Corp.*, No. 18 Civ. 7401 (NSR), 2020 WL 2766050, at *9 (S.D.N.Y. May 27, 2020) (citation omitted).

After considering these factors, the Court denies Newton leave amend.  Critically, Newton has already amended his complaint three times.  While he notes that "the first two times were early in the case to correct and revise party information," Opposition to NBCU MTD at 25, Newton's Third Amended Complaint was filed explicitly in response to Defendants' pre-motion letters previewing their arguments for dismissal of the Second Amended Complaint.  These letters provided him with "ample notice of the arguments to be lodged against [him]."  *Fratelli BVBA v. AMP Music Servs., LLC*, No. 20 Civ. 6208 (JPC), 2021 WL 4429417, at *13 (S.D.N.Y. Sept. 27, 2021) (denying leave to amend when the parties already had already amended their claims once).  Yet the Third Amended Complaint failed to resolve any of the identified deficiencies and Newton has not provided any explanation for why further amendment would be productive.  *See id.*  Denial of leave is therefore appropriate.  *See In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 188 (2d Cir. 2011).

### IV.  Conclusion

For the reasons discussed, Defendants' motions to dismiss are granted.  Newton's three causes of action are dismissed with prejudice.  The Clerk of Court is respectfully directed to close Docket Numbers 44 and 46 and to terminate this case.

       SO ORDERED.

Dated: March 17, 2023
      New York, New York

                                             JOHN P. CRONAN
                                 United States District Judge